T.C. Memo. 2008-245

UNITED STATES TAX COURT

BRIAN E. AND SANDRA SHERMER GOOD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19770-05.                    Filed October 30, 2008.

Brian E. and Sandra Shermer Good, pro sese.

<u>Kathleen K. Raup</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, <u>Judge</u>:  By notice of deficiency dated September 15, 2005 (the notice), respondent determined deficiencies in, and penalties with respect to, petitioners' Federal income tax as follows:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 2001 | $6,740 | $1,348 |
| 2002 | 5,697 | 1,137 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Petitioners bear the burden of proof. See Rule 142(a).[1]

The issues for decision arise in connection with petitioners' reported activity of providing "Electronic shopping and information services". We must decide whether petitioners (1) are entitled to credits against their income tax liabilities for amounts spent to bring that activity into compliance with the Americans with Disabilities Act of 1990 (ADA), Pub. L. 101-336, 104 Stat. 327, (2) are entitled to deductions for expenses and interest paid in connection with the activity, and (3) are subject to an accuracy-related penalty under section 6662.[2]

---

[1] Petitioners argue that the burden of proof has shifted to respondent pursuant to sec. 7491(a). We disagree. Petitioners have failed to introduce credible evidence in support of their assignment of error. See sec. 7491(a)(1). Nevertheless, respondent bears the burden of production with respect to the sec. 6662 penalty. See sec. 7491(c).

[2] In determining the deficiencies in question, respondent made certain additional adjustments that are merely computational. There is no dispute concerning those adjustments, and we do not further discuss them.

FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts, with attached exhibits, is incorporated herein by this reference.

Petitioners

Petitioners are husband and wife.  For the taxable (calendar) years in issue, they made joint returns of income.  At the time the petition was filed, they resided in Pennsylvania.

Mr. Good is a certified public accountant, and during the years in question he was a partner in an accounting firm.  Ms. Shermer Good is a graduate of Temple University and has a master's degree in business administration from Villanova University.  During the years in question, she was employed full time as a sales representative for a large pharmaceutical firm.

Petitioners' 2001 and 2002 Income Tax Returns

For both 2001 and 2002, petitioners filed an Internal Revenue Service (IRS) Form 1040, U.S. Individual Income Tax Return.  Attached to each Form 1040 is a Schedule C, Profit or Loss from Business.  The Schedules C list Mr. Good as proprietor of a business and describe the business (sometimes, the Schedule C activity) as "Electronic shopping and information services".  They show the Schedule C activity as using the cash method of accounting.

The 2001 Schedule C reports no income but reports expenses of $19, $45, and $5,475 for office expenses, travel, and "Other expenses", respectively. The other expenses are further explained as "Excess expenditures for modifications made for disabled access to business". The 2001 Schedule C reports a loss of $5,539.

The 2002 Schedule C reports gross receipts or sales of $4,228 and expenses as follows:

| Category | Amount |
| --- | --- |
| Interest | $338 |
| Office expense | 427 |
| Travel | 24 |
| Deductible meals and entertainment | 335 |
| Other expenses | 5,896 |

The other expenses are further explained as comprising $5,475 and $421 for "[e]xcess expenditures for modifications made for disabled access to business" and "[f]ranchise [f]ees", respectively. The 2002 Schedule C reports a loss of $2,792.

Also attached to each Form 1040 is an IRS Form 8826, Disabled Access Credit, claiming credits against income tax (the disabled access credits) of $5,000 and $4,491 for 2001 and 2002, respectively.

The Examination

Respondent examined the 2001 and 2002 Forms 1040 and disallowed the disabled access credits and all expenses claimed on both Schedules C (the Schedule C expenses). As a compensating

adjustment, respondent also eliminated the $4,228 of gross receipts or sales reported on the 2002 Schedule C. Respondent explained that he was disallowing the disabled access credits because petitioners had failed to show that they made any expenditures for the purpose of complying with the ADA, or, if they did, that the expenditures were reasonable and necessary and otherwise met the requirements of section 44, which allows a credit against tax for expenditures to provide access to disabled individuals. Respondent further explained that he was disallowing the disabled access credits and the Schedule C expenses because the Schedule C activity lacked economic substance and was conducted solely to avoid tax. Finally, respondent added that he was disallowing the Schedule C expenses because petitioners had failed to establish that the expenses (1) were made, (2) were ordinary and necessary business expenses, or (3) were made for the purposes indicated. The notice followed.

The Schedule C Activity

The Schedule C activity involved Internet shopping. Petitioners learned about the activity from Oryan Management and Financial Services (Oryan). During the years in issue, Oryan maintained a Web site at the Internet address (also known as a Uniform Resource Locator (URL)) http://www.ShopN2000.com. (ShopN2000.com). The ShopN2000.com Web site was a portal Web site that linked visitors to dozens of merchants. A visitor could click on a merchant's banner or on a product advertised to

purchase the product on the merchant's Web site. Oryan offered for sale URLs based on its URL but with the addition of a unique five-digit personal identification number (PIN); e.g., ShopN2000.com/62234. The purchaser of a URL from Oryan (a URL owner and a ShopN2000 URL, respectively) earned a commission if a visitor using the URL owner's PIN arrived at a merchant's Web site from a link at ShopN2000.com and made a purchase. A corporation known as "Linkshare" collected the commissions and remitted them to Oryan. Oryan then distributed them to the appropriate URL owners.

On April 13, 2004, the United States filed a "Complaint for Permanent Injunction and Other Relief" against Oryan and others in the U.S. District Court for the District of Nevada (the complaint). In part, the complaint requested the District Court to restrain and enjoin Oryan from "[o]rganizing, promoting, or selling * * * Shopn2000". The complaint made the following allegations. Oryan claimed that a URL owner could help the disabled by purchasing a ShopN2000 URL because the ShopN2000 URL purchased by the URL owner could be modified to make it accessible to the disabled. Oryan told purchasers that they could pay $10,475 ($2,495 cash and a note for $7,980) to have their Web site modified to provide access to visually, hearing, and mobility impaired users, and that such modifications would make their Web site compliant with provisions of the ADA. Oryan also told purchasers that they could have their Web sites

modified up to three times and that each modification gave rise to a $5,000 tax credit under section 44 and a $5,475 deduction under section 162 for business expenses. In fact, however, there was just one ShopN2000 Web site, not a separate one for each URL owner. Each URL owner simply received a five-digit account number (i.e., PIN) to identify the owner on the one ShopN2000 Web site. Further, the one ShopN2000 Web site already included the modifications advertised; the Web site was not modified again when each new URL owner was added to the system.

On May 3, 2004, the District Court entered a "Stipulated Final Judgment of Permanent Injunction" against Oryan and others granting the relief requested in the complaint.

Documents

On October 15, 2001, Mr. Good executed a "Contract for Sale of Website", whereby he purchased a ShopN2000 URL with the URL "Shopn2000.com/62234". The contract required no immediate payment but called for payments of 10 percent of the revenues generated by the Web site until $2,500 (with interest), had been paid.

On October 19, 2001, Mr. Good executed a "Contract for Modification and Maintenance of Website", whereby he retained Oryan to modify his URL, ShopN2000.com/62234, to make it "accessible to the visually disabled[,] in accordance with those ideals set forth in * * * [ADA section 3]." For that work he agreed to pay Oryan $10,475, a downpayment of $2,495 to be made

"upon signing this contract" and the balance, $7,980, to be evidenced by a note. On that same day, Mr. Good executed a note in Oryan's favor, obligating him to pay $7,980 (with interest), payments to be made from a portion of the revenues generated by the Web site, with any remaining balance due in 8 years.

On October 19, 2001, Mr. Good executed a "Management Agreement" with Oryan, whereby he retained Oryan to manage his URL, and he agreed to pay Oryan 15 percent "of all monies collected or vested to the Website."

On November 20, 2002, Ms. Shermer Good executed a "Contract for the Modification and Maintenance of Website", whereby she retained Advantage Management for the purpose of modifying a Web site known as "Shopn2000.com/60431" so that it "shall continue to be made accessible to the visually disabled, and further modified for accessibility for the Hearing and Speech disabled, in accordance with those ideals set forth in * * * [ADA], section 3." The payment terms are the same as the terms in the similar agreement between Mr. Good and Oryan executed on October 19, 2001, except that payments are to be made to Advantage Management. She signed a note similar to the note he signed (together, the notes). The note she signed, like the contract she signed, refers to a Web site known as "ShopN2000.com/60431".

On November 20, 2002, Ms. Shermer Good executed a "Management Agreement" with Oryan, whereby she retained Oryan to manage URL "Shopn2000.com/60431", for a fee of $15 a year.

Petitioners have never owned a Web site with the address ShopN2000.com/60431.

Compensation Arrangements

Although petitioners believed they would earn commissions with respect to purchases made using their PIN, they received no document setting forth a commission schedule in connection with their consideration of ShopN2000.com. Petitioners expected to earn commissions ranging, generally, from 1 to 4 percent on sales made through ShopN2000.com/62234.

Petitioners also believed that they would earn $2 as advertising income every time a visitor to ShopN2000.com/62234 clicked on a merchant's banner displayed there, although they received no document specifying that.

Payments

On September 10, 2001, Mr. Good incurred a credit card charge of $2,495 in favor of "Nevada Corporate HQ's" and on December 27, 2002, Ms. Shermer Good wrote a check for $2,495 to "Okto Marketing Group". At the time Mr. Good made the first payment, petitioners believed that they would be able to claim a disabled access credit of $5,000 on their 2001 Federal income tax return. At the time Ms. Shermer Good made the second payment, petitioners believed that they would be able to claim a disabled access credit of approximately $4,900 on their 2002 Federal income tax return.

## Operations

Mr. Good received the following commissions from his ownership of ShopN2000/62234:

| Year | Amount |
|------|--------|
| 2001 | -0- |
| 2002 | $19.60 |
| 2003 | 10.67 |
| Unknown | 1.52 |

Mr. Good received no direct payment of any advertising income. Petitioners believe that advertising income was applied to reduce the balance of the notes. Petitioners have not otherwise made any payments on the notes.

In early 2003, Mr. Good received an IRS Form 1099-MISC, Miscellaneous Income, for 2002 (the 2002 Form 1099) from G&J Eagle Enterprises, Inc., referring to account No. 62234 and showing "Other Income" of $4,198.

Petitioners marketed their URL only by word-of-mouth to friends and family and to one or two handicapped people they saw on the street.

## Other Events

Sometime after May 2004, Mr. Good went on the Internet to ShopN2000.com/62234 and discovered that the URL was no longer operating.

Mr. Good telephoned Oryan. The person answering the phone refused to answer any of his questions.

Petitioners neither sought the return of any of the moneys that they paid to Oryan nor took any legal action against Oryan for breach of contract.

No one has contacted petitioners seeking payment of the notes.

Respondent's Expert Witness

Respondent offered, and the Court accepted, Thomas M. Niccum (Mr. Niccum) as an expert witness in the field of computer science and Web site business design, operation, and valuation. Mr. Niccum is president of Lancet Software Development, Inc., a software consulting and Web hosting firm. He has the following academic degrees: bachelor of computer science, magna cum laude, master of science in computer science, and a Ph.D. in computer science. He has published articles on data management, and he has taught in the field of computer science. The Court received his written report as his direct testimony. See Rule 143(f)(1). He has various opinions concerning the design, operation, and valuation of ShopN2000.com, which he characterized as "an Internet shopping Web site accessed at http://www.shopn2000.com." His opinions include the following:

-- The site was relatively small, with only a few pages and limited functions;

-- the promoters of the site were not selling Web sites but, more accurately, were activating PIN numbers. There was only one Web site, where different PIN

numbers were used only to track usage and, possibly, to allow some customized content;

-- every PIN, enabled for that purpose or not, appeared to have access to the text-only site for the visually impaired;

-- the text-only site did not work well;

-- security features enabled by users would interrupt the site's ability to associate usage with a particular PIN;

-- ShopN2000.com had a poor business model: The site had only a few links to shopping Web sites, and it did not appear to offer any useful functions, such as price comparisons or product reviews. The site merely gave a simple display of stores and some product categories and offered rudimentary search tools;

-- the ShopN2000.com business model did not work well: By 2004, there were hundreds of complaints on the Internet describing problems with the site and lack of profits being made by ShopN2000.com URL owners;

-- a ShopN2000.com URL was not a viable business opportunity for a purchaser;

-- the purchaser of a ShopN2000.com URL acquired only the rights to a Web address, and acquired no software, code, copyrights, documentation, licenses, or other intellectual property;

-- the domain name "ShopN2000.com" was not transferred to the URL owner;

-- ShopN2000.com URL owners would have difficulty attracting advertisers, and advertising would not provide a significant source of income, given the low volume of traffic ShopN2000.com URL owners could realistically expect;

-- petitioners could not have resold their ShopN2000.com URL;

-- the value of the ShopN2000.com URL was practically nil.

OPINION

I. Introduction

On brief, respondent characterizes the Schedule C activity as "a tax-motivated promotion * * * that petitioners believed would allow them to spend $2,495 in 2001 and $2,495 in 2002 to obtain Disabled Access Credits of $5,000 in 2001 and $4,900 in 2002." He has disallowed not only the disabled access credits petitioners claimed but also the Schedule C expenses, and he asks for an accuracy-related penalty.

Petitioners claim on brief:

Taxpayers owned and operated a small business with the primary and predominant purpose of making a profit. The business income, operations and deductions were appropriately documented and substantiated. The Respondent's claims otherwise, as well as its [sic] basis for accessing [sic] addition to tax is without merit.

As set forth in our findings, respondent has multiple grounds for his adjustments. He has disallowed the disabled access credits because he believes that petitioners have failed to show that they made any expenditures for the purpose of complying with the ADA, or, if they did, that those expenditures were reasonable and necessary and otherwise met the requirements of section 44. Alternatively, he has disallowed the disabled access credits, and the Schedule C expenses, because he believes the Schedule C activity lacked economic substance and was conducted solely to avoid tax. Finally, he has disallowed the Schedule C expenses because he believes that petitioners failed to establish that the expenses (1) were made, (2) were ordinary and necessary business expenses, or (3) were made for the purposes indicated.

We shall sustain respondent's disallowance of the Schedule C expenses and the disabled access credits on the grounds that petitioners have failed to substantiate that they made the expenditures involved. We shall also sustain the accuracy-related penalties.

II. The Schedule C Expenses and Disabled Access Credits

    A. Introduction

The Schedule C expenses consist of claimed expenditures for interest, office expenses, travel, meals and entertainment, and "Other expenses". The other expenses are explained as being for modifications to allow the disabled access to the Web site (the

Web site modification expenses) and franchise fees.  The disabled access credits consist of additional expenditures beyond the Web site modification expenses claimed to have been made to modify the Web site to comply with the ADA.[3]  We shall first consider the Schedule C expenses other than the Web site modification expenses and then consider those expenses together with the disabled access credits.

B.  Schedule C Expenses Other Than Web Site Modification Expenses

In general, section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  To be deductible, however, such expenses must be substantiated.  E.g., Hradesky v. Commissioner, 65 T.C. 87 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976); see also sec. 6001; sec. 1.6001-1(a), Income Tax Regs.  Moreover, we need not accept the unverified and undocumented testimony of the taxpayer as substantiation.  Hradesky v. Commissioner, supra at 90.  Finally, certain deductions, such as those relating to travel and entertainment expenses, are subject to strict substantiation requirements.  See sec. 274(d).

---

[3]  Sec. 44 allows a credit for an expenditure to provide access to disabled persons, but sec. 44(d)(7) denies a deduction for the same expenditure.

Petitioners claim that they are entitled to deduct the Schedule C expenses under sections 162 and 212.[4]  Section 212 is similar to section 162 in that it allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year" in connection with, among other things, "the production or collection of income".  We assume that petitioners are relying primarily on section 162(a) since they describe the Schedule C activity as a "small business".  See supra section I. of this report.  In any event, we would reach no different result if we were to consider the Schedule C activity under section 212.

The questions respondent has raised relating to substantiation involve questions of fact; e.g., whether Mr. Good, a cash method taxpayer with respect to the Schedule C activity, can substantiate his 2002 Schedule C expense of $427 for office expenses.  And while petitioners have in the petition assigned error to respondent's determinations of deficiencies in tax and penalties, they have failed to comply with the requirement of Rule 34(b)(5) that the petition contain clear and concise statements of the facts on which the petitioner bases the assignments of error.  Moreover, at the conclusion of the trial, we instructed the parties to file briefs, and we directed Mr. Good to our Rules as to the form and content of briefs.  We emphasized the importance of making proposed findings of fact.

---

[4]  In 2002, petitioners deducted $338 of interest that, if deductible, would be deductible under sec. 163.

See Rule 151(e)(3).  Nevertheless, petitioners have failed to include in their opening brief any proposed findings of fact, including only the following statement under the heading "Petitioners' Request for Findings of Fact":  "The facts have been stipulated and as so [sic] are found.  The stipulation of facts and the attached exhibits are attached are [sic] incorporated herein."  We shall do our best in the light of the inadequate assistance provided by petitioners.

We can dispose summarily of the Schedule C expenses other than the Web site modification expenses; viz, the deductions for office expenses and travel for 2001 and for interest, office expense, travel, deductible meals and entertainment, and, under the category "Other expenses", franchise fees for 2002.  Putting aside for the moment petitioners' claim of travel expenses incurred in 2002, petitioners have not provided adequate substantiation of the claimed expenses.  For substantiation, petitioners offer only their own testimony and Mr. Good's self-generated computer records.  Petitioners offer no receipts or other evidence corroborating their testimony and Mr. Good's records.  We need not, and do not, accept their unsupported testimony and records as adequate substantiation.  See Hradesky v. Commissioner, supra.

With respect to petitioners' 2002 travel, the parties have stipulated that, in October 2002, petitioners traveled to Mexico for a vacation and paid for meals while there.  Petitioners have

failed to substantiate by adequate records or by sufficient evidence corroborating their statements the business purpose of the meal expenditures or the business relationship to them of persons they entertained, and for that reason no deduction under section 162 or 212 is allowable. See sec. 274(d).

C. <u>Web Site Modification Expenses and Disabled Access Credits</u>

Section 44 provides small businesses with a credit for expenditures to comply with the ADA. Petitioners claim to have spent $10,475 in both 2001 and 2002 to comply with the ADA. Because of limitations on the amount of ADA compliance expenditures creditable against tax, petitioners claimed disabled access credits of only $5,000 and $4,491 for 2001 and 2002, respectively. They did not, however, ignore the noncreditable portions of their claimed ADA compliance expenditures, and they deducted $5,475 each year as part of the Schedule C expenses; i.e., the Web site modification expenses.

We have in evidence two contracts (the contracts), each entitled "Contract for Modification and Maintenance of Website", and both calling for total payments of $10,475, a downpayment of $2,495 to be made "upon signing of this contract" and the balance, $7,980, to be evidenced by a note (the notes). The first contract is between Mr. Good and Oryan; it was signed by him on October 19, 2001; it calls for modification of his URL, ShopN2000.com/62234, and it requires that he make the $2,495

downpayment to Oryan.  The second contract is between Ms. Shermer Good and Advantage Management; it was signed by her on November 20, 2002; it calls for modification of a URL, ShopN2000.com/60431, that petitioners did not own, and it requires that she make the $2,495 downpayment to Advantage Management.  On September 10, 2001, Mr. Good paid $2,495 by credit card to "Nevada Corporate HQ's", and, on December 27, 2002, Ms. Shermer Good paid $2,495 by check to "Okto Marketing Group" (together, the cash payments).  Presumably, petitioners claimed the cash payments as a portion of either Web site modification expenses or the disabled access credits.[5] Respondent concedes that the cash payments were made, but views the payments not as fees to modify petitioners' Web site to accommodate the disabled but, essentially, as their expenditure to participate in a bogus tax avoidance scheme.  Petitioners have failed to convince us that the cash payments were made for the purpose they claim; i.e., to modify petitioners' Web site to accommodate the disabled.

Perhaps in an unguarded moment, Ms. Shermer Good testified on cross-examination that petitioners made their September 10, 2001, payment of $2,495 "for the franchise."  If they made the payment "for the franchise", i.e., to participate in the Schedule

---

[5]  We cannot be sure, since, as stated, petitioners neither supported the petition with clear and concise statements of fact nor provided any proposed findings of fact on brief.

C activity for 2001, that could explain why they made it 39 days before Mr. Good signed a contract purporting to modify his Web site (and, indeed, 35 days before he acquired that Web site). That might also explain why the payment was made to Nevada Corporate HQ's, rather than to Oryan, the party to whom the contract required petitioners to make the downpayment. The facts surrounding the contract signed by Ms. Shermer Good are also suspicious. The contract she signed referred to the wrong URL, she did not pay Advantage Management, as required by the contract, but paid "Okto Marketing Group", and she made the payment 37 days after the due date of the payment required by the contract. In both cases, other than the correspondence of the amounts paid to the downpayments called for by the contracts, there is little evidence to support petitioners' claim that the cash payments were made for Web site modifications to accommodate the disabled. Indeed, there is evidence that no such modifications were ever intended, at least by the promoters of ShopN2000.com. Respondent's expert, Mr. Niccum, testified that there was only one Web site, to which each URL owner had access by way of a PIN, and that every PIN, enabled for that purpose or not, appeared to have access to the text-only site for the visually impaired. That testimony is consistent with the allegations in the complaint that led to the injunction against Oryan's organizing, promoting, or selling ShopN2000 URLs. Petitioners criticize Mr. Niccum for looking at ShopN2000.com

only in retrospect and without having access to the underlying computer codes. Although aware in advance of Mr. Niccum's testimony, petitioners presented no expert testimony in rebuttal. Mr. Niccum impressed us with his knowledge of computers and Web sites, and we have confidence in his opinions. We do not believe that any modifications were ever made to petitioners' Web site to accommodate the disabled. More importantly, petitioners have failed to convince us that they made the cash payments for the purpose of obtaining modifications to their Web site. Considering Ms. Shermer Good's testimony, Mr. Niccum's testimony, the discrepancies between the payment terms of the contracts and petitioners' actual payments, and the identification of the wrong URL in the contract signed by Ms. Shermer Good, we believe that petitioners made the cash payments to secure, as Ms. Shermer Good describes it, "the franchise"; i.e., to secure undeserved tax benefits well in excess of the cash payments, and not for Web site modifications to accommodate the disabled.

Before concluding this portion of our analysis, there is one further issue to discuss. The contracts each call for deferred payments of $7,980, the balance of the $10,475 contract price above the required downpayment of $2,495. The notes evidenced those payments and stated that the deferred payments were to be made from a portion of the revenues generated by the Web site. Petitioners believed that advertising revenue of $2 would be applied to the notes every time a visitor to ShopN2000.com/62234

clicked on a merchant's banner.  The 2002 Form 1099 shows a payment to Mr. Good of "[o]ther [i]ncome" of $4,198 from G&J Eagle Enterprises, Inc., referring to account No. 62234. Although their briefs are unclear, petitioners appear to argue that the 2002 Form 1099 evidences advertising revenue of $4,198 applied in 2002 to Mr. Good's note.  There is, however, no evidence other than the 2002 Form 1099 that Mr. Good earned any advertising revenue from the operation of ShopN2000.com/62234 in 2002.  Petitioners have not identified G&J Eagle Enterprises, Inc.  Advertising revenue of $4,198 would indicate 2,099 clicks in 2002.  Mr. Niccum is of the opinion that, given the low volume of traffic expected by a ShopN2000.com URL owner, it would be difficult to attract advertisers and advertising would not provide a significant source of income.  We are not persuaded that the 2002 Form 1099 is legitimate.  Petitioners have failed to persuade us that they earned any advertising revenue in 2002, or that $4,198 was credited against either note.

Petitioners have failed to show that they expended any money in either 2001 or 2002 to modify their Web site to accommodate the disabled.  Petitioners are not entitled to deductions for the Web site modification expenditures or to the disabled access credits.

D. <u>Conclusion</u>

We sustain respondent's adjustments disallowing the Schedule C expenses and the disabled access credits.

III. <u>Section 6662 Penalty</u>

Section 6662 imposes a penalty equal to 20 percent of the portion of any underpayment which is attributable to, among other things, a substantial understatement of income tax. Sec. 6662(a) and (b)(2). An understatement of income tax is deemed substantial if it exceeds the greater of: (1) 10 percent of the tax required to be shown on the return for the year, or (2) $5,000. Sec. 6662(d)(1)(A). For those purposes, the amount of an understatement is reduced to the extent it is attributable to a position (1) for which there is substantial authority, or (2) which the taxpayer adequately disclosed on his return and for which there is a reasonable basis. Sec. 6662(d)(2)(B). In addition, the section 6662 penalty does not apply to the extent the taxpayer can show that there was reasonable cause for the underpayment and that he acted in good faith with respect thereto. Sec. 6664(c)(1).

Giving effect to respondent's adjustments in the notice, petitioners' additional tax liabilities for 2001 and 2002 were $6,740 and $5,697, respectively. The taxes required to be shown on petitioners' returns for 2001 and 2002 were $28,432 and $34,606, respectively. Since each of the understatements exceeds $5,000 (which is greater than 10 percent of the tax required to

be shown on the returns--$2,843 in 2001 and $3,461 in 2002), those understatements are substantial within the meaning of section 6662(d)(1)(A).

Respondent bears the burden of production with respect to the section 6662(a) penalty. See sec. 7491(c). We have previously stated that the "burden imposed by section 7491(c) is only to come forward with evidence regarding the appropriateness of applying a particular addition to tax or penalty to the taxpayer." Weir v. Commissioner, T.C. Memo. 2001-184. Respondent has satisfied his burden of production. Nevertheless, the accuracy-related penalty specified by section 6662(a) is not imposed with respect to any portion of the underpayment as to which the taxpayer has acted with reasonable cause and good faith. Sec. 6664(c)(1). The taxpayer bears the burden of proving his entitlement to section 6664(c)(1) relief. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Petitioners are well educated, with experience in business and accounting. Indeed, Mr. Good is a certified public accountant and, during the years in question, was a partner in an accounting firm. Petitioners should have been aware that the ShopN2000.com was a tax-reduction scheme. We are convinced that, without tax benefits, there was no reasonable prospect of making any money from the scheme. Petitioners have failed to show that they understood anything different. Petitioners have failed to show that, with respect to

any portion of the underpayments, they acted with reasonable cause and in good faith.

Petitioners are liable for the section 6662(a) penalty determined by respondent.

IV. <u>Conclusion</u>

Petitioners are liable for the deficiencies in tax and penalties determined by respondent.

<u>Decision will be entered</u>

<u>for respondent</u>.