Meyer Feldman v. Commissioner.
Feldman v. Commissioner
Docket No. 2650-66.
United States Tax Court
T.C. Memo 1968-19; 1968 Tax Ct. Memo LEXIS 275; 27 T.C.M. (CCH) 98; T.C.M. (RIA) 68019; January 31, 1968. Filed *275 Held, the fair market value as of July 2, 1953, the date of death of petitioner's wife, of certain business property located at 100 E. Alameda Street in downtown Tucson, Arizona, which was owned by petitioner and his wife on the date of her death, was $100,000, allocable $55,000 to the land and $45,000 to the improvements, instead of $45,000 to the land and $55,000 to the improvements as determined by the respondent. William L. Raby, for the petitioner. Edward H. Boyle, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income tax for the calendar years 1962 and 1964 in the amounts of $1,139.55 and $5,928.48, respectively. Although the deficiencies for both years were challenged in the petition, *276 petitioner now concedes the deficiency for 1962. For 1964 petitioner assigns error as follows: (b) The Commissioner erroneously determined that the tax basis of certain land sold in 1960, the gain on the sale of which was being reported on the installment basis, was $45,000, and that therefore that basis should be used in calculating the proper percentage of profit to be reported in connection with payments on such sale received in 1964. Both parties agree that under section 1014(a) and (b)(6) of the Internal Revenue 99 Code of 1954, [1] the entire basis of the land sold in 1960 (both the one-half community interest received by the petitioner from his wife's estate and the one-half community interest owned by decedent at the time of his wife's death) was the fair market value of such land on July 2, 1953, the *277 date of his wife's death. Respondent determined it to be $45,000, whereas petitioner claims it was $100,000. Findings of Fact Some of the facts were stipulated. The stipulation, together with all of the exhibits attached thereto, is incorporated herein by reference. Petitioner resided in Tucson, Ariz., at the time of the filing of his petition. He filed *278 his Federal income tax returns for the calendar years 1962 and 1964 with the district director of internal revenue in Phoenix, Ariz. In November 1950 petitioner and his wife, Esther, acquired in downtown Tucson, Ariz., certain business property described as Lots 9, 10, and 11, in Block 255, of the City of Tucson, and hereinafter sometimes referred to as the 100 E. Alameda Street property. Lot 11 had an area of 9,475 square feet and was acquired from Don Hummel and Eugenia Hummel in a trade of some other property. Lots 9 and 10 had an area of 15,000 square feet and were acquired by purchase from Gerald Swanick and Julia Swanick for $85,000. On Lots 9 and 10 were improvements consisting of a residential court and a warehouse. Petitioner moved the residential court to other property owned by him and continued to rent the warehouse under the same terms as with the previous owner, namely, at $100 per month. On June 8, 1951, petitioner entered into a 5-year lease of the 100 E. Alameda Street property, excluding the warehouse, to one Blakley. The Blakley lease required petitioner to construct a gasoline service station, which he did at a cost of approximately $25,000 in 1951. The lease *279 also provide for a rental payment at the rate of 1 cent a gallon for the first 50,000 gallons, and one-half cent per gallon for the excess over 50,000 gallons, with the minimum monthly rental being $750. On July 2, 1953, petitioner's wife, Esther B. Feldman, died. A Federal estate tax return for the estate of Esther B. Feldman, deceased, was filed with the district director of internal revenue, Phoenix, Ariz., on October 1, 1954. The return reported decedent's one-half community interest in the 100 E. Alameda Street property and assigned thereto a date of death value of $50,000. Petitioner was the executor of his wife's estate. The date of death value was based upon an appraisal by Mark Klafter, a real estate appraiser, Walter E. Lovejoy, a real estate agent, and David Kramer, a certified public accountant. The appraisal was made on the basis of fair market value. The appraisal was embodied in a report dated September 2, 1954, and a certified copy filed with the Superior Court in and for the County of Pima, Ariz., on September 10, 1954. The appraisal report places a value of $100,000 on the 100 E. Alameda Street property without allocating any value as between land and improvements. *280 Kramer, one of the three appraisers, relied upon the valuations made by Lovejoy and Klafter. Kramer prepared the estate tax return and all the figures in it and, since 1950, has prepared income tax returns for petitioner. Lovejoy has been president of the Arizona Trust Company for 34 years and has been directly concerned with valuing real estate in Tucson for 50 years. The Arizona Trust Co. offices are two blocks from the 100 E. Alameda Street property. In valuing the property, Lovejoy took into consideration its income-producing factors. Klafter has made real estate appraisals in Tucson since 1941 and has specialized in making appraisals since 1950. During that period he prepared approximately 3,000 appraisal reports of various types. There was a big boom in the value of downtown Tucson property after 1953 which was not evident in 1953. 100 On June 1, 1955, petitioner leased the 100 E. Alameda Street property (which he then owned, one-half by purchase and one-half as a devisee from the estate of his wife) to Lawrence D. Mayer for a period of 99 years with an option to purchase the leased premises for $160,000. The lease gave Mayer the right to destroy any of the existing *281 buildings provided they were replaced with buildings costing at least $75,000. In August 1957, Mayer removed the existing buildings, which consisted of the gasoline service station and the warehouse, and replaced them with a parking garage costing in excess of $400,000. As of the date of valuation, July 2, 1953, demand was limited, supply was great, and utility was impaired because of adverse economic conditions which affected the real estate market in downtown Tucson. On either joint or separate income tax returns as filed for the years 1950 through 1956 petitioner computed depreciation on the 100 E. Alameda Street property by resorting to figures which the parties cannot now verify. Petitioner was claiming depreciation of the warehouse and service station on a basis of $74,866.05. The petitioner's taxable years 1954, 1955, and 1956 were audited by a revenue agent who, in his report dated October 22, 1957, adjusted the claimed depreciation on the 100 E. Alameda Street property to fit within the $100,000 valuation placed on the property by the three appraisers in 1954. The $100,000 valuation was allocated by the agent on the basis of $45,000 for land and $55,000 for improvements *282 (warehouse and service station). The agent then determined that from July 2, 1953, through December 31, 1956, the deductible depreciation on the improvements was $7,700, [2] leaving a remaining undepreciated balance on December 31, 1956, of $47,300. The agent then disallowed depreciation claimed by petitioner for each of the years 1954, 1955, and 1956 of $520.14 for each year and determined deficiencies for those years on that basis. Petitioner agreed to pay the deficiencies resulting from the revenue agent's examination. In his return for 1957, because of the removal by Mayer of the service station and the warehouse from the 100 E. Alameda Street property, petitioner claimed as a loss his unrecovered basis in the service station and warehouse in the amount of $48,400 (subsequently determined to be $47,300) which had been demolished by the lessee. The revenue agent, in a report dated January 8, 1960, concluded that the unrecovered basis of the demolished buildings represented a cost of the lease to the taxpayer which was properly amortizable *283 [3] over the remaining life of the lease and not allowable as a deduction in 1957, and determined a deficiency for the year 1957 of $24,696.45. The petitioner disagreed with the conclusion of the revenue agent on the law issue and filed a protest with the district director on March 16, 1960. The protest was disallowed, whereupon petitioner paid the deficiency for 1957 on August 7, 1961, and filed a claim for refund on August 9, 1961. The claim for refund was disallowed and petitioner brought suit in the United States District Court for the District of Arizona on March 14, 1962. The District Court, on April 11, 1963, sustained the district director. Feldman v. Wood (not officially reported) 11 A.F.T.R. 2d 1359. In that suit the parties stipulated for purposes of the case and the District Court found as a fact that: 3. As of July 2, 1953 (the date of death of plaintiff's wife), the property was valued at $100,000, apportioned at $55,000 for buildings and $45,000 for land. (Stip. No. 1, par. 5.) The petitioner appealed to the Ninth Circuit and, on August 5, 1964, that court reversed the District *284 Court and held that petitioner was entitled to deduct as a loss his basis in the demolished buildings. Feldman v. Wood, 335 F. 2d 264. Thus, petitioner was ultimately allowed as a deduction on his 1957 return the amount of $47,300 representing his unrecovered basis in the buildings (warehouse and service station) which had been demolished by the lessee in 1957. On July 1, 1960, Mayer, the lessee of the subject property at 100 E. Alameda Street, exercised his option and purchased 101 the said property for $160,000. A downpayment of $1,000 was received and, in his 1960 Federal income tax return which was filed on April 15, 1961, petitioner elected to report the gain from the sale on the installment method. The net profit was computed by petitioner as follows: Gross sales price
$160,000.00
Less:
Basis
$100,000.00
Expense of sale 928.50
Adjusted cost 100,928.50
Net profit
$ 59,071.50
Ratio of profit in sales basis
36.92% The petitioner reported 36.92 percent, or $369.20 of the $1,000 in his 1960 return. After the sale of the property in 1960 and the receipt of a downpayment of $1,000 no further payments were received until *285 1964 when petitioner received $75,000. Petitioner reported 36.92 percent of this amount, or $27,690, in his return for 1964, one-half of which, or $13,845, he returned as a long-term capital gain. The respondent, in determining the deficiency for 1964, increased the long-term capital gain reported of $13,845 by $12,890.52, and, in a statement attached to the deficiency notice, explained his determination as follows: (b) It is determined that you realized a long-term capital gain in the amount of $53,471.03 resulting from the sale of property described on your return for 1964 as Alameda Street (L. Meyer [sic]). Accordingly, such gain is taken into account to the extent of 50 percent, or $26,735.52 in lieu of $13,845.00 reported on your return. Therefore, your taxable income for 1964 is increased in the amount of $12,890.52. [4]
*286 The petitioner takes the position that the fair market value of the land which was sold in 1960 was $100,000 as of July 2, 1953, and that this amount is the tax basis of the land for purposes of determining gain or loss thereon, and that the computation of gain was correctly shown on petitioner's return for 1960 and for the taxable year here involved. The respondent takes the position that the correct basis of the property in 1960 was $45,000 instead of $100,000 and that this is the correct basis for determining gain upon sale in 1960. Ultimate Findings The fair market value of the land and improvements at 100 E. Alameda Street was $100,000 as of the date of death of Esther B. Feldman on July 2, 1953. A fair allocation of the total value was $45,000 apportioned to the improvements and $55,000 apportioned to the land. Opinion In computing the gain on the sale in 1960 of the three lots (land only) of the 100 E. Alameda Street property, is the proper basis $45,000 as determined by respondent, $100,000 as claimed by petitioner, or some other amount? The parties agree that the proper basis is the fair market value of the lots on July 2, 1953, the date of death of petitioner's *287 wife. [5]
It is well settled that the value at which property is returned for estate tax purposes is prima facic the value for the purpose of computing depreciation and gain or loss on subsequent sale. Such value is not conclusive but is a presumptive value which may be rebutted by clear and convincing evidence. The value at which property is returned for estate tax purposes is, however, entitled to great weight. Williams v. Commissioner, 44 F. 2d 467, 469 (C.A. 8, 1930), affirming [Dec. 4835] 15 B.T.A. 227; Rogers v. Helvering, 107 F. 2d 394, 396 (C.A. 2, 1939), affirming on this point 31 B.T.A. 994, 1006; Tax Regs. sec. 1.1014-1(a) and 3(a); and Rev. Rul. 54-97 (1954-1 C.B. 113). These lots were the community property of petitioner and his deceased wife. Petitioner was the executor of his wife's estate. Preparatory *288 to filing the Federal estate tax return, petitioner, who himself was a shrewd dealer in real estate, engaged Klafter and Lovejoy, two expert appraisers of real estate in the downtown business section of Tucson, 102 to appraise the three lots in question along with 15 other items of real estate owned in community by petitioner and his wife. These two witnesses were respondent's witnesses in this case. On July 2, 1953, the date of the wife's death, there were improvements on the 3 lots, consisting of a warehouse which was renting for $100 per month, and a relatively new gasoline service station which brought in a minimum monthly rental of $750. About February 1954, Klafter and Lovejoy appraised the 3 lots together with the improvements thereon as of July 2, 1953, at $100,000, one-half of which was included in the Federal estate tax return as a part of the wife's gross estate. At the hearing held in 1967, both Klafter and Lovejoy reaffirmed their appraisal made in 1954 of $100,000 for both land and improvements. At that time Klafter and Lovejoy did not make an allocation of the $100,000 as between land and improvements, as that was not necessary for estate tax purposes. At the hearing, *289 counsel for respondent asked Klafter this question: Q. Mr. Klafter, although you made no allocation back in 1954 regarding the improvements on the land, do you have an opinion as to what value might have been placed on the improvements or the land? Klafter answered that in his opinion the buildings would have a value of approximately $45,000 and the land a value of approximately $55,000. The respondent's determination was $55,000 for the buildings and $45,000 for the land. Petitioner contends that the value of the land alone on July 2, 1953, was $100,000. He bases this contention on the appraisal made in 1965 by Sanders K. Solot, a real estate appraiser in Tucson. Solot never saw the improvements that were on the property in 1953. His appraisal is as to the value of the land only. He stated he could give no opinion as to the value of the improvements on July 2, 1953. His testimony was: I think there would be a problem as to the valuation as to the improvement as of a date such as this in 1953 when the property was inspected by me in July of 1965 because the improvements were not there. I would not be competent to appraise the improvements since I didn's see them as of that *290 date. Solot based his appraisal as to the value of the land solely on what he considered to be eight comparable sales. However, two of the so-called eight sales were not sales but leases and the evidence concerning them is of no aid to our problem. One of the sales was the sale of a part of the very property here in question, namely, Lots 9 and 10, which petitioner and his then wife purchased from the Swanicks in November 1950. It is obvious that part of the purchase price of $85,000 was paid for the improvements on the property, namely, the warehouse, and petitioner immediately started to take depreciation on the warehouse on the alleged cost basis of $46,816.05. The same criticism can be made to practically all the other sales in Solot's appraisal. He considered the total price paid by the purchaser as attributable to the land alone and disregarded the improvements as a factor of cost or value to the buyer. Thus, the price per square foot for the land was in each instance some figure greater than actuality. To find the proper price paid per square foot for the land alone in these alleged comparables it would have been necessary to show how much of the purchase price was being paid *291 for the land and how much for the improvements thereon. Solot did not attempt to do this in any convincing manner, either by way of testimony or in his report. Nevertheless, Solot concluded that "the market value of the subject site, as of July 2, 1953, is equal to $5.00 per square foot," or $122,375 (rounded to $122,000) for the 24,475 square feet in the three lots of the Alameda property. Petitioner rested after offering Solot's testimony and appraisal. We do not think petitioner has rebutted the value at which the property was returned for estate tax purposes, which value is entitled to great weight. Rogers v. Helvering, supra.The evidence offered by petitioner is not, in our opinion, clear and convincing. The value at which the property was returned for estate tax purposes was $100,000 for the land and improvements. As Klafter said in his testimony: We looked at it on the basis: what was the whole ball of wax worth; what was the entire property worth on the date of death. Klafter and Lovejoy appraised this "ball of wax" at $100,000. They both reaffirmed that value at the hearing. We do not think the fair market value of the land and improvements of the 100 *292 E. Alameda Street property on July 2, 1953, was in excess of $100,000. Lovejoy said he did not think the speculative value of the land alone, without buildings, on July 2, 1953, would be very high. Considering the fact that petitioner, who was a shrewd dealer in real estate, returned 103 the property for estate tax purposes at $100,000, that he thereafter claimed depreciation on the improvements on the property on a basis of over $74,000, which the Commissioner later reduced to $55,000, all of which amount has been returned to petitioner by way of depreciation deductions of $7,700 and a loss of $47,300, the matter of the loss having been carried to the United States Court of Appeals for the Ninth Circuit, and the further fact that there was a big boom in the value of downtown Tucson property after 1953 which was not evident in 1953, at which period the demand for real estate in downtown Tucson was limited and the supply was great, we have concluded and have found as an ultimate fact that on July 2, 1953, the fair market value of the land and improvements of the 100 E. Alameda Street property was $100,000, allocable $55,000 to the land and $45,000 to the improvements. The deficiency *293 for 1964 will be recomputed on that basis. Decision will be entered under Rule 50. Footnotes
1. SEC. 1014. BASIS OF PROPERTY ACQUIRED FROM A DECEDENT. (a) * * * the basis of property in the hands of a person acquiring the property from a decedent * * * shall * * * be the fair market value of the property at the date of the decedent's death * * *. (b) * * * For purposes of subsection (a), the following property shall be considered to have been acquired from * * * the decedent. * * * (6) In the case of decedents dying after December 31, 1947, property which represents the surviving spouse's one-half share of community property held by the decedent and the surviving spouse under the community property laws of any State * * * (Note: Under section 25-211A, Arizona Revised Statutes↩ "A. All property acquired by either husband or wife during the marriage * * * is the community property of the husband and wife.")
2. July 2, 1953 to December 31, 1953 $1,100 Calendar year 1954 2,200 Calendar year 1955 2,200 Calendar year 1956 2,200 $7,700 ↩
3. Cf. Tax Regulations, section 1.165-3(b)(2).↩
4. The $53,471.03 mentioned in the above determination was determined by respondent as follows: ↩
Gross sales price
$160,000.00
Less: Basis
$45,000.00
Expense of Sale 928.50
Adjusted basis 45,928.50
Net profit
$114,071.50
Ratio of profit to gross sales price
71.2947%
71.2947% times $75,000 equals
$53,471.03
5. It may be noted that in his answer respondent alleged that petitioner is estopped from denying that his basis of the land sold in 1960 was $45,000 but at the hearing and on brief counsel for respondent stated that there was no longer an issue of estoppel in the case.↩