T.C. Memo. 2013-235

UNITED STATES TAX COURT

BRETT VAN ALEN AND KIMBERLEE VAN ALEN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BRANDON D. TOMLINSON AND SHANA C. TOMLINSON, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 22328-09, 4075-10.[1]          Filed October 21, 2013.

Jared R. Callister, for petitioners.

Nathan H. Hall, for respondent.

---

[1] We consolidated these cases for trial, briefing, and opinion.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  Shana Tomlinson and Brett Van Alen are siblings who inherited part of a family ranch from their father.  Their interest was in a trust, and their stepmother valued that interest at less than $100,000 when she prepared her late husband's estate-tax return.  That value was low because the Code gives a break to those who inherit a ranch and promise to keep it in agricultural use. Years later, the trust sold a conservation easement on the ranch for more than $900,000.  The sale created a capital gain that passed through to the siblings, and the dispute here is over the proper basis to report for that sale.  Shana and Brett argue that through no fault of their own the estate greatly understated the value of their interest in the ranch, which greatly understated their basis, which greatly inflated their taxable capital gains.  The Commissioner says this doesn't matter, and that the tax break they got then by using a very low value on their father's estate-tax return has to be matched now by a hefty capital-gains tax burden.

FINDINGS OF FACT

I.     The Family Ranch

Near the turn of the twentieth century, Joseph "Pop" Preuschoff left Europe for Madera County, California--just north of Fresno--and established a 2345-acre cattle ranch that became known as the Preuschoff Ranch.  It was on this ranch

**[*3]** that Pop raised his daughter, Mary Van Alen. Although Mary moved away for a short time after getting married and starting a family, she divorced and returned home to the ranch with her small children. One of those children was Joseph Van Alen. Joseph later inherited a 13/16th interest in the ranch (the Ranch Interest).

Joseph married three times. After his first marriage with four children ended in divorce, Joseph wed Virginia Latimer, a woman twenty years his junior. Within four years, they had two children--Shana and Brett. The siblings were still quite young when Virginia and Joseph divorced, and afterwards they lived with their mom, though they did stay with their dad on the ranch every other weekend as well as half of every summer. Joseph eventually wed again. Shana and Brett, however, didn't get along with this new wife, Bonnie Van Alen. Shana described Bonnie as a "very dominant person" with whom she "had a tumultuous relationship." Despite these difficulties, the siblings loved their time on the ranch. Brett remembered helping his dad with the daily chores--kicking hay out of the backs of trucks and shoveling manure. And, after Joseph's death, Shana moved to the ranch where she tends some cows and works as a stay-at-home mom to her three children. Brett--though he does not live on the ranch--grew up to be a

**[\*4]** cowboy in the vaquero tradition, riding horses and four-wheelers to tend cattle for other ranchers.

II.    The Will, Probate, and Estate Tax Return

Joseph died in May 1994, when Shana was 18 and Brett was only 14. Almost ten years before his death--after his separation from Virginia but before his marriage to Bonnie--Joseph had written his will.  It gave $25,000 gifts to his first wife and each of his four children from that marriage, but directed that the remainder of the estate--including his Ranch Interest--would go to a testamentary trust (the Trust) for the benefit of Shana and Brett in equal shares.  The will contained no estate-tax apportionment clause.[2]

Bonnie, as the estate's executor, hired attorney Denslow Green to administer Joseph's estate.  Since California probate law requires that a county "probate referee" appraise a decedent's real property subject to probate, see Cal. Prob. Code sec. 13200(c) (West 1991 & Supp. 2013), Green met in November

---

[2] Wills sometimes contain such a clause to direct where the money to pay taxes will come from, but if they don't state law supplies a default rule.  See Riggs v. Del Drago, 317 U.S. 95, 97-98 (1942); Estate of Leach v. Commissioner, 82 T.C. 952, 962-64 (1984), aff'd without published opinion, 782 F.2d 179 (11th Cir. 1986).  California's default rule provides that any estate tax must be equitably prorated among the persons interested in the estate.  See Cal. Prob. Code sec. 20110(a) (West 2011).  It splits the estate-tax bill among the beneficiaries in the same proportion that the values of their inheritance bears to the total value of the estate.  Id. sec. 20111.

[*5] 1994 with Richard Grey, a deputy probate referee.[3]  This was a complicated

chore--the ranch alone had nine different tax parcel numbers, and the estate held

other real estate apart from the ranch.  Grey set to work, and valued the Ranch

Interest at $1.963 million.  When he was done, he gave his field notes to the

probate referee.[4]

About nine months later, Bonnie (as executor) and Green (as preparer) filed

a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return,

for the Estate of Joseph Van Alen.[5]  But that return gave the Ranch Interest a much

lower value than Grey's field notes did.

---

[3] Grey worked under the supervision of Richard Huber, the Madera County probate referee.

[4] Because Shana and Brett didn't submit Grey's field notes as an expert report in compliance with Rule 143(g), we didn't allow Grey to testify as an expert witness as to his opinion of the Ranch Interest's fair market value when Joseph died.  We did allow him to testify as an eyewitness to what he submitted as values to the probate referee.  (Unless we say otherwise, all references to Rules are to the Tax Court Rules of Practice and Procedure.  All bare references to sections are to the Internal Revenue Code in effect for the relevant time.)

[5] Section 2001 imposes a tax on "the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  Section 2051 defines the taxable estate as "the value of the gross estate" less any applicable deductions. A tentative estate tax is then computed on the sum of the taxable estate plus adjusted taxable gifts, reduced by gift tax payable on post-1976 gifts.  See sec. 2001(b).  That amount is further reduced by the unified credit, see infra note 8, and by other available credits such as state death-tax credits, see infra note 9.  The resulting amount is the net estate tax due.

**[\*6]**   The return also showed a taxable estate that was cash-poor.  It valued the

gross estate at just over $2 million,[6] but almost $1.9 million was real estate or

miscellaneous property (such as vehicles, farm equipment, household furnishings,

and cattle).  The estate deducted $260,000 in miscellaneous expenses (such as

funeral costs, debts, and mortgages) and $870,000 in bequests to Bonnie as the

surviving spouse.[7]  That left a taxable estate of a little over $900,000, and--after

subtracting the unified credit[8] and credit for state death taxes[9]--the estate reported

a tax due of about $100,000.

---

[6] The gross estate includes "all property, real or personal, tangible or intangible, wherever situated," to the extent provided in sections 2033 through 2045.  Sec. 2031(a); Estate of Giovacchini v. Commissioner, T.C. Memo. 2013-27, at \*31.

[7] Subject to exceptions not relevant here, property passing from a deceased husband to his widow is deductible from his gross estate.  See sec. 2056(a).  Although Joseph didn't name Bonnie in his will because he had executed it before their marriage, California law treats her as an omitted spouse.  See Cal. Prob. Code sec. 6560 (West 1994).  As a result, she was entitled to receive--and the Form 706 reported that she did receive--his one-half of community property and one-third of his separate property.  See Cal. Prob. Code secs. 6401, 6560 (West 1994).

[8] The unified credit exempts a minimum amount of accumulated wealth from estate tax.  Since Joseph didn't make any taxable gifts during his life, the unified credit available to his estate was $192,800 (equivalent to a $600,000 exemption).  See sec. 2010(a).

[9] Estates of decedents dying before 2005 generally could credit against the federal estate tax the amount of any state death taxes.  See sec. 2011(f).

**[\*7]**  The tax bill would have been significantly higher, however, had the estate valued the Ranch Interest at $1.963 million--the value that Grey said he submitted to the probate referee.  Instead, the estate listed that interest's fair market value as only $427,500.  Even at that unusually low value for so many acres of California ranchland, the Ranch Interest would have been one of the estate's most valuable assets.  But the estate computed its tax not with this number, but with an even lower number--$144,823, which the return reported as the Ranch Interest's value under section 2032A(d)(2).

This section helps those who inherit property by letting them use an asset's value in its actual use at the time of death, rather than in its hypothetical highest and best use.  (The paradigmatic case is a family farm that otherwise might have to be sold to a developer.)  Not all kinds of property, and not all kinds of heirs, qualify for this deviation from the general rule that death tax is calculated on an estate's fair market value.  And the heirs have to promise not to sell the property right away, or shift its use to something more valuable.  If an estate wants to use this lower value, it has to make a section 2032A election, and there are forms that have to be filled out and sent in with the return.

**[*8]**    There's little doubt that the estate met these conditions.  The estate's

"qualified heirs"[10]--Bonnie, Shana, and Brett (who as a minor was represented by

his mother, Virginia, both as his guardian *ad litem* and as trustee of the Trust)[11]--

all executed an agreement to special valuation under Section 2032A, which they

included with the estate-tax return.[12]

The form they used included the required language by which they consented

to personal liability for additional estate tax if they stopped using the ranch for

agricultural purposes or sold their interest altogether.  And no one disputes that

this standard-form language is also sufficient proof of each heir's actual or

constructive understanding that completing the form is required.  The

Commissioner nevertheless disputed the estate's valuation of the Ranch Interest

because he thought that the correct value should have been $427,500.  The estate

---

[10] A "qualified heir" is, "with respect to any property, a member of the decedent's family who acquired such property (or to whom such property passed) from the decedent."  Sec. 2032A(e)(1).

[11] Neither Brett nor Shana dispute that their mother had the power to act as Brett's guardian *ad litem*, and they do not claim that she breached any fiduciary duty acting in that capacity.

[12] The estate also elected to value three other properties (not at issue here) under section 2032A.  Section 2032A saved them a lot of money--it shrank the value of taxable properties from an aggregate fair market value (or, to be more precise, an aggregate *stated* fair market value) of just over $1 million to only $260,000.

**[*9]** and the IRS went back and forth, and the estate remarkably and audaciously sent the IRS an amended section 2032A valuation that *lowered* the value put on the Ranch Interest to only $98,735.[13] Even more remarkably, the IRS accepted the revised amount, perhaps because the estate increased the section 2032A value for two of the other properties it had elected for special-use valuation and removed altogether a section 2032A election for another property. The bottom line was that the IRS got an increase in the total taxable value of the estate to about $1 million and an increase in the estate tax of about $20,000 (to nearly $120,000).

Even with the very low special-use valuation of the Ranch Interest, the estate didn't have enough liquid assets to immediately pay that $120,000.[14] We also expressly find that Shana and Brett were the biggest winners of the estate's

---

[13] The record did not include an amended agreement to special valuation. We do, however, have a cover letter from Green to an IRS attorney in which he wrote that enclosed with the letter was an "Amended Agreement to Special Valuation executed by Bonnie Van Alen, Shana Charlotte Van Alen and Virginia M. Latimer as Trustee and Guardian Ad Litem for Brett Shannon Van Alen who is still a minor." Because of that cover letter, and because the IRS eventually accepted the values contained on the amended Schedule A-1, Itemized Deductions (which it would not have done absent the amended agreement), we find it more likely than not that Bonnie, Shana, and Brett (by Virginia on Brett's behalf) executed the amended agreement to special valuation, and that this amended agreement satisfied the requirements of section 2032A(d)(2) just as the original agreement had.

[14] The record is a bit unclear, but it seems probable that the estate elected to pay a portion of the estate tax in installments as permitted by section 6166(a).

[*10] aggressive and successful valuation because they received the lion's share of the taxable estate.[15] With those two things in mind--and without an estate-tax apportionment in the will saying otherwise--we also find that a significant increase in the valuation of the Ranch Interest for estate-tax purposes might well have forced the Trust--which was the remainder beneficiary of the estate and whose sole beneficiaries were Shana and Brett--to sell at least parts of the ranch to pay the estate tax.

III.     Reporting the Sale of the Conservation Easement

In May 2007--almost ten years after the estate settled its tax liability--the California Rangeland Trust bought a conservation easement on the Preuschoff Ranch for $1.12 million. Reflecting its 13/16th interest, the Trust received $910,000 from that sale.

The Trust and the siblings reported this deal in so muddled a way that the IRS was bound to notice. In June 2008 the Trust's accountants filed the Trust's 2007 income-tax return, on which it reported the $910,000 sale price for the conservation easement and a basis of about $100,000. After subtracting various

---

[15] We note again that amounts owed to Bonnie as the surviving spouse were already taken into account in computing the taxable estate. See supra note 7 and accompanying text. The only other beneficiaries under Joseph's will were his first wife and their four children, who were each to receive $25,000 cash.

[*11] other trust-level deductions, the Trust reported income of almost $720,000 and an income-distribution deduction in the same amount for distributions made to the siblings.[16] Shana and Brett's Schedules K-1, Beneficiary's Share of Income, Deductions, Credits, etc., each reported a net long-term capital gain of nearly $360,000.

Almost four months later, though, the Trust filed an amended 2007 return. On this return, the Trust listed the same sale price ($910,000), but reported a new and nearly doubled basis, which reduced the Trust's capital gain. Shana and Brett's amended Schedules K-1 each showed a reduced long-term capital gain of about $310,000.

But the siblings seemed to balk at reporting any gain at all. Brett and his wife filed their 2007 return in June 2008 (before the Trust filed its amended return), and Shana and her husband filed theirs in September 2008 (after the Trust filed the amended return). Although Brett and Shana each had a K-1 from the Trust showing over $300,000 in net long-term capital gain, neither of them

---

[16] A trust is generally allowed to deduct taxable income distributed to its beneficiaries. See secs. 651, 661. The income-distribution deduction "'implements the he-who-gets-the-income-pays-the-tax principle. If a trust keeps income, the trust is supposed to pay tax on it. But if a trust distributes income, the beneficiary is supposed to pay the tax.'" Daniels v. Commissioner, T.C. Memo. 2012-355, at *3 n.1 (quoting Tarpo v. Commissioner, T.C. Memo. 2009-222).

[*12] reported any of this gain on their 2007 individual tax returns.[17] This mismatch spurred the Commissioner to send them each a CP2000 Notice--to Brett and Kimberlee in February 2009, and to Brandon and Shana in August 2009.[18] Each notice listed a proposed balance due, and stated that the amount of income they reported on their respective 2007 Forms 1040 didn't match the amounts reported on documents the IRS received from third-party payors. For Brett, those unreported amounts included not just the large capital gain from the original Trust K-1, but also $924 of unreported interest income (which he has since stipulated that he received); for Shana, those unreported amounts were the large capital gain from the amended Trust K-1, and $15,000 of nonemployee compensation from a Form 1099-MISC issued by Ogle Productions, Inc. Each notice also proposed an

---

[17] Brandon and Shana later submitted an amended 2007 individual return to the IRS in November 2009, but as we discuss infra note 20, that return is not at issue here.

[18] The IRS sends this notice (called in tax jargon a "CP2000 Notice") to a taxpayer when the income and payment information that the IRS has on file from third parties for that taxpayer doesn't match the entries reported on the taxpayer's return. See IRS, Understanding Your CP2000 Notice, http://www.irs.gov/Individuals/Understanding-Your-CP2000-Notice (last visited July 31, 2013).

[*13] accuracy-related penalty. Neither couple paid, and the Commissioner followed up with a notice of deficiency.[19]

After receiving his notice of deficiency, Brett visited local CPA Paul Simmons. Brett showed him the notice as well as his father's estate-tax return to ask him whether the Trust properly reported the basis of the Ranch Interest that led to the long-term capital gain on the K-1s. After reviewing those papers, Simmons testified that "it just didn't seem right to me that something in 1994 was worth nothing hardly." Simmons then made a call to a friend whom he had used to perform appraisals in the past to ask him to look at a piece of property to determine its 1994 value. That friend was Richard Grey.

Grey told Simmons that he had called the right guy--he was the one who performed the 1994 appraisal for the Ranch Interest. Grey then told Simmons that he had appraised the Ranch Interest at $1.963 million and eventually gave him a copy of his field notes.

This prompted Simmons to submit, in November 2009, yet another amended 2007 return for the Trust. This second amended return reported the same sale

---

[19] Note that Brett's CP2000 was based on the Trust's original K-1, but Shana's was based on the Trust's amended K-1. The Commissioner now believes that the basis reported on the Trust's original return was correct. The Commissioner thus asked at trial to seek an increase in the deficiency for Shana based on her original K-1, and we granted his motion.

[*14] price, but now reported a basis of slightly less than $900,000, which shrank the gain to less than $25,000. Simmons explained in an attachment that the reduction in capital gain was "due to an error in the computation of basis for the [Ranch Interest]." Trust-level deductions completely wiped out that gain, and Brett and Shana's new K-1s showed no long-term capital gain.[20] In reporting an inherited basis in the Ranch Interest that was much higher than its special-use valuation, Simmons relied on Revenue Ruling 54-97, 1954-1 C.B. 113. He described that revenue ruling as saying that "if there was a mistake made and you could prove that the mistake was made and you had evidence that the value was wrong, then you could use [the new] value."

The Commissioner stuck by his notices of deficiency. He argues that even if the Trust's initial value for the Ranch Interest was too low, perhaps absurdly low, for land in California, it was still the value on which the estate calculated its estate tax and thus the value that the Code and precedent compel the heirs to use in computing their gain when part of that interest is sold.

---

[20] Shana submitted an amended 2007 return around the same time that reported the amounts listed on the Trust's from the latest 2007 Trust return and the $15,000 of nonemployee compensation income from Ogle Productions, Inc. It appears the Commissioner didn't accept this amended return, nor did he have any obligation to do so. See Fayeghi v. Commissioner, 211 F.3d 504, 507 (9th Cir. 2000), aff'g T.C. Memo. 1998-297. The parties have since stipulated that Shana had $15,000 in "unreported income" from Ogle Productions, Inc.

[*15] The Van Alens and the Tomlinsons filed timely petitions, and we consolidated their cases for trial in San Francisco. Both couples were California residents when they filed their petitions and remain so today.

OPINION

The dispute here is over basis--the parties agree that the Trust received $910,000 in proceeds from the sale of the easement. They disagree, however, on the amount of passthrough capital gain from those proceeds that the siblings should have reported. To determine that capital gain, we must first decide what effect the Ranch Interest's section 2032A valuation has on calculating the Trust's basis for the sale. Shana and Brett argue that the 2032A value doesn't bind the Trust. They say that Grey's appraised value of the Ranch Interest provides clear and convincing evidence that someone other than they made a mistake when reporting the 2032A value. They also argue that we should look to Grey's appraised value as a starting point to redetermine what should have been the 2032A value--not to increase their father's taxable estate, but rather only to recalculate the Trust's basis in the Ranch Interest.[21]

---

[21] Indeed, the Commissioner couldn't redetermine the Ranch Interest's 2032A value reported on the Form 706 because the statute of limitations has run. See sec. 6501.

**[*16]** I.  Section 2032A Alternate Use Valuation

We start with an explanation of the interplay between section 2032A and general principles of estate-tax law.  One of those general principles is that the value of property for estate-tax purposes is its fair market value.  See sec. 2031; Estate of Elkins v. Commissioner, 140 T.C. ___, ___ (slip op. at 37) (Mar. 11, 2013); sec. 20.2031-1(b), Estate Tax Regs.  And fair market value is the highest and best use of the property on the valuation date.  See Estate of Kahn v. Commissioner, 125 T.C. 227, 240 (2005); Estate of Mitchell v. Commissioner, T.C. Memo. 2011-94, 2011 WL 1598623, at *5.  Section 2032A is an exception to this general rule and embodies a congressional judgment that the heirs of small businesses and farms should not be forced by death to sell their family's legacy to pay the taxman.  See LeFever v. Commissioner, 100 F.3d 778, 782 (10th Cir. 1996), aff'g 103 T.C. 525 (1994).  As we said in Estate of Maddox v. Commissioner, 93 T.C. 228, 232 (1989):

> Congress was obviously troubled that family farms might have to be sold to pay estate taxes upon death of the owner if the value of the real estate were determined at its fair market value which in turn depended upon its "highest and best use."  Since such real estate might well be a tempting target for real estate developers, the "highest and best use" test could result in a valuation based on development purposes substantially in excess of the value of the property for use as a farm, with a concomitant large increase in estate taxes.  Continued operation of the family farm might thus be in jeopardy since a sale of

**[\*17]** the farm might be the only way to meet the increased tax burden.  It was to address this problem that section 2032A was enacted.

Section 2032A's cure for this problem is to create an exception to the general principle that an estate's property is valued at its fair market value, and instead allow it to choose to value some property on its actual use at the time of the decedent's death.[22]  LeFever, 100 F.3d at 782.  To elect the special-use valuation, section 2032A requires that the decedent must have been a citizen or resident of the United States; the property must be qualified real property; the

---

[22] Section 2032A allows for real property used in farming to be valued on the basis of income capitalization.  See LeFever v. Commissioner, 103 T.C. 525, 532 (1994), aff'd, 100 F.3d 778, 782 (10th Cir. 1996).  The Code, however, limits the special use valuation:  "The aggregate decrease in the value of qualified real property * * * which results from the * * * [election] * * * shall not exceed $750,000."  Sec. 2032A(a)(2).  (For estates of decedents dying in a calendar year after 1998, the $750,000 ceiling on the aggregate valuation decrease is adjusted for inflation.  See sec. 2032A(a)(3) (added by the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 501(b), 111 Stat. at 845-46)).  The Court has already noted the aggressive prediscounted valuations of the Estate's real property.  This seems to have enabled the estate to use nearly the entire $750,000.  See supra notes 12 and 13 and accompanying text.

Subject to that limitation, the benefits of this special use valuation may be combined with other valuation discounts in some circumstances.  Compare Estate of Maddox v. Commissioner, 93 T.C. 228, 229-31 (1989) (disallowing minority interest discount), with Estate of Hoover v. Commissioner, 69 F.3d 1044 (10th Cir. 1995) (distinguishing Estate of Maddox and allowing a minority interest discount), rev'g 102 T.C. 777 (1994).  These complex variations of section 2032A valuation are not on the program in these cases, and we'll discuss them no further.

**[*18]** executor must elect to apply section 2032A; and--pay attention here--each person who has an interest in the property must sign and file a personal liability agreement. Sec. 2032A(a), (b), (d). The parties agree that Joseph's estate met all the requirements to elect the special-use valuation for the Ranch Interest. Their dispute is about the effect that the estate's valuation has on the Trust's basis in the Ranch Interest.

II.     Basis of Inherited Property

We now look at the rules for figuring out the basis of inherited property. The basis of inherited property is generally equal to its fair market value at the date of the decedent's death. Sec. 1014(a)(1). However, "in the case of an election under section 2032A," the basis of property acquired from a decedent is "its value [as] determined under such section"--not its fair market value. Sec. 1014(a)(3); see also sec. 1.1014-3(a), Income Tax Regs ("[T]he value of property as of the date of decedent's death as appraised for the purpose of the Federal estate tax or the alternate value as appraised for such purpose, whichever is applicable, shall be deemed to be its fair market value"). This makes sense, as the U.S. Court of Claims aptly explained:

> The identity of the two values in the congressional mind is clearly
> indicated by the fact that the election by the decedent's estate to use
> the alternate valuation date binds the subsequent income tax payer.

**[\*19]** This would be often meaningless if the value figure chosen did not bind him also.

The success of an estate in getting through IRS audit a low valuation of property may turn into a Pyrrhic victory in the event of subsequent income taxation. This is a matter practitioners in the field are well aware of and it tends to minimize disputes as to the valuation of estates, where assets other than listed securities are involved, and especially with real property. It furthers the concept of self-assessment. * * *

Hess v. United States, 537 F.2d 457, 462-63 (Ct. Cl. 1976). This means that the Trust's inherited basis in the Ranch Interest should be its section 2032A value.[23]

After accounting for trust-level deductions and the distributions made by the Trust to its beneficiaries, that basis would result in long-term capital gains of nearly $360,000 to both Shana and Brett.

III.    Revenue Ruling 54-97

The siblings, however, feel that they can overcome this straightforward application of the Code with Revenue Ruling 54-97, which they argue lets the

---

[23] Here there's another niggling detail: The estate reported a final section 2032A value of $98,735, but the Commissioner conceded on brief that $102,226 is the correct value. (This may reflect, for example, the cost of improvements to the Ranch, which would increase the Trust's basis.)

**[\*20]** Trust report a basis in the Ranch Interest different from its 2032A value.[24]

That revenue ruling says:

> For the purpose of determining the basis under section 113(a)(5) of the Internal Revenue Code of property transmitted at death (for determining gain or loss on the sale thereof or the deduction for depreciation), the value of the property as determined for the purpose of the Federal estate tax shall be deemed to be its fair market value at the time of acquisition. Except where the taxpayer is estopped by his previous actions or statements, such value is not conclusive but is a presumptive value which may be rebutted by clear and convincing evidence.

Rev. Rul. 54-97, supra.[25]

---

[24] Taxpayers can rely on published revenue rulings. See sec. 601.601(d)(2)(v)(d ), Statement of Procedural Rules ("Revenue Rulings * * * do not have the force and effect of Treasury Department Regulations * * *, but are published to provide precedents to be used in the disposition of other cases, and may be cited and relied upon for that purpose"). They are not however binding on us; since we review them only as "the opinion of a lawyer in the agency." N. Ind. Pub. Serv. Co. v. Commissioner, 105 T.C. 341, 350 (1995) (citation and internal quotation marks omitted), aff'd, 115 F.3d 506 (7th Cir. 1997); see also Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. 202 (2009), aff'd, 679 F.3d 1109 (9th Cir. 2012). We do, however, treat revenue rulings as concessions by the Commissioner where those rulings are relevant to our disposition of the case. Rauenhorst v. Commissioner, 119 T.C. 157, 171 (2002) (listing cases).

[25] In the nearly sixty years since its issuance, we have cited this revenue ruling twice--and one of those citations was in a dissent. See Feldman v. Commissioner, T.C. Memo. 1968-19, 1968 Tax Ct. Memo LEXIS 275, at \*13 ("It is well settled that the value at which property is returned for estate tax purposes is prima facie the value for the purpose of computing depreciation and gain or loss on subsequent sale. Such value is not conclusive but is a presumptive value which may be rebutted by clear and convincing evidence. The value at which property is

(continued...)

**[\*21]** Throwing a lasso around that language, Shana and Brett try to tie up their ample evidence--clear and convincing evidence, they say--that the reported section 2032A value was wrong. They rely on Grey's "appraisal and conclusion of value" of $1.963 million, which they say "is extremely credible as it was prepared near the decedent's death, in his capacity as a deputy probate referee, for the purposes of probating the property and not prepared in response to litigation." Using a fair market value of $1.963 million, they ask that--after applying the "reduction in fair market value limitation" under section 2032A(a)(2)--we increase the 2032A value to about $1.375 million for purposes of determining the Trust's inherited basis in the Ranch Interest.[26]

---

[25](...continued) returned for estate tax purposes is, however, entitled to great weight"); Estate of Mueller v. Commissioner, 107 T.C. 189, 226-27 n.23 (1996) (Beghe, J., dissenting) (noting Commissioner's inconsistent treatment of shares at issue) ("It would be inconsistent to hold * * * shares to have had one value for estate tax purposes and another for income tax purposes. There is a presumption that the estate tax value of an asset is correct and applies also to determine income tax basis."), aff'd, 153 F.3d 302 (6th Cir. 1998).

[26] Here's the math: As mentioned supra note 22, the aggregate reduction from the fair market value of all properties that have elected a 2032A special use valuation can't exceed $750,000. See sec. 2032A(a)(2). Shana and Brett argue that since the Ranch Interest constituted 78.32% of the fair market value of the qualified properties (on the basis of a $1.963 million fair market value), the Ranch Interest should be allocated just over 78% of the allowable $750,000 deduction. See Boris I. Bittker & Lawrence Lokken, Federal Taxation of Incomes, Estates

(continued...)

**[\*22]** We think this would be a difficult argument to win with. Section 113(a)(5) of the Internal Revenue Code of 1939 is substantially identical to current section 1014(a)(1), and it might be reasonable for taxpayers to rely on this revenue ruling if they were calculating their basis under section 1014(a)(1). But the Van Alens and the Tomlinsons are arguing about basis that the Code tells us to calculate under section 1014(a)(3), which says that inherited basis should equal its 2032A value.

The siblings, however, say it would be wrong to saddle them with the lowball value of the estate-tax return, because it was an executor and guardian *ad litem* who signed off on that value, not the two heirs themselves. We don't think we need to settle the argument about the old revenue ruling's applicability here, because the Commissioner points us to a different, and possibly clearer doctrine that might solve this case--the duty of consistency. He says that this duty of

---

[26](...continued)
and Gifts, para. 135.6.7, at 135-110 (2d ed. 1993) (when the election covers two or more qualified properties and the reduction in value exceeds the $750,000 limit, the reduction should be applied *pro rata* among the properties.) Based on that percentage, Shana and Brett acknowledge, the Ranch Interest could only be reduced from $1.963 million to about $1.375 million under section 2032A.

**[\*23]** consistency, as developed in our caselaw, trumps the siblings' invocation of the old Revenue Ruling.[27]

## IV. Duty of Consistency

The duty of consistency "serves to prevent inequitable shifting of positions by taxpayers." Janis v. Commissioner, 461 F.3d 1080, 1085 (9th Cir. 2006), aff'g T.C. Memo. 2004-117. An equitable doctrine also known as quasi-estoppel, the duty of consistency "is based on the theory that the taxpayer owes the Commissioner the duty to be consistent with his tax treatment of items and will not be permitted to benefit from his own prior error or omission." LeFever, 103 T.C. at 541. The Ninth Circuit has opined:

> "When all is said and done, we are of the opinion that the duty of consistency not only reflects basic fairness, but also shows a proper regard for the administration of justice and the dignity of the law. The law should not be such a[n] idiot that it cannot prevent a taxpayer from changing the historical facts from year to year in order to escape a fair share of the burdens of maintaining our government. Our tax system depends upon self assessment and honesty, rather than upon hiding of the pea or forgetful tergiversation."

Janis, 461 F.3d at 1085 (quoting Estate of Ashman v. Commissioner, 231 F.3d 541, 544 (9th Cir. 2000), aff'g T.C. Memo. 1998-145). The Ninth Circuit has listed three conditions that we have to find before we can invoke this duty:

---

[27] We note that the siblings do not cite, much less rely on, section 1.1014-3, Income Tax Regs., and we therefore do not address it.

**[*24]** • A representation or report by the taxpayer;

   • reliance by the Commissioner; and

   • an attempt by the taxpayer after the statute of limitations has run to change the previous representation or to recharacterize the situation in such a way as to harm the Commissioner.

See id.; Estate of Ashman, 231 F.3d at 545. If all those elements are present, the Commissioner may act as if the previous representation--on which he relied--continued to be true, even if it is not. And the taxpayer is estopped to assert the contrary.

We address each element.

A. Representation by the Taxpayers

The big dispute here is over the first requirement--namely whether the taxpayers here made a "representation" on the estate-tax return. Shana and Brett argue that they couldn't have done so because neither of them had any fiduciary powers or control over the estate; they "were merely its beneficiaries."

We're not persuaded.

We consider first whether the siblings could be the "taxpayer" who is making a "representation" on an estate-tax return. If it's the same taxpayer who's making inconsistent statements at different times, it's an easy case. But what about a situation like this one, where it was an executor and a guardian *ad litem*

[*25] who made the first representation and two heirs (now adults) who make the second? The caselaw tells us that the duty of consistency "'is usually understood to encompass both the taxpayer and parties with sufficiently identical economic interests.'" Janis, 461 F.3d at 1085 (quoting LeFever, 100 F.3d at 788). There are lots of cases that hold that the duty of consistency binds an estate's beneficiary to a representation made on an estate-tax return if that beneficiary was a fiduciary of the estate. See, e.g., Estate of Letts v. Commissioner, 109 T.C. 290, 298 (1997); Cluck v. Commissioner, 105 T.C. 324, 333 (1995); Janis v. Commissioner, T.C. Memo. 2004-117, 2004 WL 1059516, at *11 (listing cases). But the cases don't limit us to that situation and instead say that the question of whether there is sufficient identity of interests between the parties making the first and second representation depends on the facts and circumstances of each case. See, e.g., Estate of Letts, 109 T.C. at 298; Cluck, 105 T.C. at 335; Janis, 2004 WL 1059516, at *11.

We think it makes the most sense to gauge whether the specific economic interests of those making the earlier and later representations are sufficiently identical. And here we have to find that they are. Both Shana and Brett, and their father's estate, benefited from a reduced estate tax. If the estate had valued the Ranch Interest at $1.375 million under section 2032A (the amount now asserted

[*26] by the siblings), the tax liability of the estate would probably have gone up by over half a million dollars.  See former sec. 2001(c)(1).  Under California probate law, the Trust--which would have received more than half of the value of Joseph's estate as its residual beneficiary--would have been responsible for paying over half of that additional liability.  And Shana and Brett were the Trust's sole beneficiaries.

Shana and Brett argue, however, that even if their economic interests were sufficiently identical, that's still not a close enough relationship to bind them to the valuation reported on the estate tax return.  They point out that the Ninth Circuit in Janis also required a "sufficient privity of interest between the parties."  And, because they weren't the estate's fiduciaries, they argue "it is indisputable that they did not have sufficient privity of interest."

Let's take a closer look.

Since Ninth Circuit law controls here,[28] we start with the facts of Janis. Janis did not involve an individual taxpayer trying to disavow an estate's section 2032A special-use valuation.  Instead, the taxpayer-husband in Janis, in his capacity as the coexecutor of his father's estate, valued his father's art collection at

---

[28] Because these cases are appealable to the Ninth Circuit, we follow that court's precedent.  See, e.g., Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

[*27] about $12.4 million on the estate-tax return.  Janis, 461 F.3d at 1082.  After

negotiations with the IRS, he agreed to a value of about $14.5 million and signed a

Form 890, Waiver of Restrictions on Assessment and Collection of Deficiency and

Acceptance of Overassessment.  Id.  As a beneficiary of the estate, he inherited a

portion of that collection.  Id. at 1084.  After the statute of limitations had passed

for the IRS to make further assessments of estate tax, he claimed a higher market

value as his basis.  Id. at 1082-83.  We sided with the Commissioner, holding that

the duty of consistency required that the taxpayers use as their basis the

collection's value reported on the estate tax return.  See Janis, 2004 WL 1059516,

at *11.

The Ninth Circuit agreed, stating that the taxpayer-husband "had

overlapping and co-extensive interests as a beneficiary and co-executor of the

estate."  Janis, 461 F.3d at 1085.  It then determined that the taxpayer-husband

"[a]s an heir, * * * had an economic interest in reducing the value of the taxable

estate, and as a co-executor, he had privity of interest with the estate, thus making

the duty of consistency appropriate under these circumstances."  Id. (citing

LeFever, 100 F.3d at 789).

That language certainly suggests that the Ninth Circuit believes that the

doctrine should not be applied to just any estate beneficiary.  But the siblings here

[*28] weren't merely just beneficiaries of the estate that had nothing to do with filing the estate-tax return. On two occasions, Shana and Brett (through his guardian *ad litem*) executed agreements for the estate tax return consenting to the election to value the Ranch Interest under section 2032A--an agreement specifically acknowledging that it was a condition precedent to making the election.

One might think Brett has a stronger argument--he didn't sign either version of the special valuation agreement because he was a minor, and Virginia's signature as his guardian *ad litem* was not his representation. Citing Ford v. United States, 276 F.2d 17 (Ct. Cl. 1960), Brett says that "courts disfavor the application of the duty of consistency because of the inequity imposed upon a minor." But here, unlike the taxpayers in Ford, the minor--Brett--was represented by a guardian *ad litem*, and that guardian was required to make a representation on the estate-tax return for the section 2032A election to be effective. And as noted earlier, neither Brett nor Shana have alleged that Virginia lacked the power to act as his guardian *ad litem* or that her representation breached any fiduciary duties.

They contend that they had no involvement in the preparation of the estate-tax return; rather "it was their stepmother, with whom they had a strained relationship, who was conducting all estate administration duties." Thus, they say

**[\*29]** that they "should not be deemed to somehow have privity of interest in the Estate simply because their stepmother had them sign the special valuation agreement." Even if we were to construe this allegation to imply a claim that Bonnie exerted undue influence or otherwise coerced Shana or Virginia (in her capacity representing Brett) to sign the agreement, they have not proven any facts supporting such a claim.

In this regard, we find significant the Ninth Circuit's citation of LeFever with approval when mentioning the term "privity of interest." See Janis, 461 F.3d at 1085. LeFever also involved taxpayers trying to disavow a section 2032A election. The taxpayers, one of whom was an executor of the estate that elected the 2032A valuation, were both qualified heirs to the 2032A property. LeFever, 100 F.3d at 783. As required by section 2032A, they both signed agreements consenting to personal liability for any additional taxes imposed as a result of the sale of the qualified property or cessation of a qualifying use. Seven years after they filed the election, the Commissioner determined that they had stopped using the property for a qualified use. The taxpayers argued that they were never actually entitled to the special-use valuation and that the three-year statute of limitations barred additional assessments against the estate. Id.

**[\*30]** We applied the duty of consistency to preclude them from denying the validity of the special-use election. See LeFever, 103 T.C. at 525. In doing so, we took great pains to emphasize the representations that the taxpayers had made as qualified heirs on the decedent's estate-tax return. See id. at 544. On appeal, they contended that they shouldn't be bound by representations made in the estate-tax return because they weren't the same taxpayer as the one on whose behalf the estate-tax return was filed. See LeFever, 100 F.3d at 786.

The Tenth Circuit rejected their argument. Although it acknowledged some authority that an heir should not be bound by representations of the estate's executor, id. at 788 (citing Ford, 276 F.2d at 17), it said that the "the duty of consistency is usually understood to encompass both the taxpayer and parties with sufficiently identical economic interests." Id. The Tenth Circuit held that the taxpayers--as qualified heirs--did have an economic interest in reducing the value of the taxable estate. Id. at 789. It also held that the taxpayers "had sufficient privity of interest with the estate's executor for the application of the duty of consistency." Id. Although mentioning that one of the taxpayers was also the estate's executor, the Tenth Circuit placed more emphasis on the fact that both taxpayers made a representation on the estate-tax return in their capacities as qualified heirs: They both signed the agreement consenting to the election, a

**[\*31]** prerequisite to obtaining the special-use valuation. See id. at 788-89

("[B]oth [taxpayers] signed a consent form to the taking of the election"); id. at

789 ("*Petitioners* represented that [the properties] qualified for the special use

valuation election in the estate tax return and supporting documents.'" (Emphasis

added). The Court therefore held that the taxpayers were bound by the duty of

consistency to representations made on the estate-tax return. Id. Because the

Commissioner relied on those representations, and the taxpayers attempted to

change their position after the running of the statute of limitations, the Tenth

Circuit concluded that we had properly applied the doctrine. Id.

As in LeFever, Shana and Brett's affirmative consent to elect the section

2032A special use valuation as qualified heirs distinguishes them from

beneficiaries that have nothing at all to do with the filing of the estate-tax return.

Cf. Shook v. United States, 713 F.2d 662, 668 (11th Cir. 1983) ("None of the * * *

estoppel cases extend the [duty of consistency] doctrine to an estate beneficiary for

merely indicating approval of the executors' handling over which they have total

control and the beneficiary none"); Ford, 276 F.2d at 22 (refusing to bind taxpayer

beneficiaries of estate to an estate valuation of stock because both taxpayers were

minors without knowledge of what was reported on their father's estate tax

return). The IRS could not have accepted the special valuation without the

[*32] representations they made on the special valuation agreements.  See sec.

2032A(a)(1)(B), (d)(2).  Their representations were essential to getting that estate-

tax return filed, and so we find that their execution of the special valuation

agreements, together with their shared economic interests with their father's estate,

bind them to the special-use valuation reported on the estate-tax return.

B.    The Commissioner's Reliance and Taxpayers' Change in Position
      After Statute of Limitations Has Expired

Shana and Brett don't appear to contest the existence of the second and third

elements here:  Reliance by the Commissioner and, after the limitations period, a

change in the taxpayers' position in a way that's harmful to the Commissioner.

But just to be sure, we specifically find that the Commissioner relied on the

section 2032A election.  The statute of limitations for assessment of estate tax then

ran.  See sec. 6501(a).  And, only after it ran did Shana and Brett argue that the

section 2032A valuation was grossly understated.  "The Commissioner was surely

prejudiced by this change in position because the Commissioner can no longer

collect the tax deficiency occasioned by Petitioners' turnabout."  Janis, 461 F.3d at

1080.  Accepting Shana and Brett's invitation to revise the section 2032A election

would allow them to whipsaw the Commissioner.  The estate could escape the

burden of an additional estate tax on $1.2 million of value while at the same time

**[\*33]** giving the Trust (and Shana and Brett as its sole beneficiaries) an extra $1.2 million of basis to offset amounts realized from the conservation easement sale as well as future sales of the Ranch Interest. This cannot be right.

We rest our holding on the unequivocal language of section 1014(a)(3). That section requires that the Trust's inherited basis in the Ranch Interest equal the section 2032A special-use valuation. And we rest it as well on a duty of consistency that is by now a background principle of tax law. But we also note that the section 2032A election served its purpose here--it allowed an illiquid estate to pay a reduced estate tax, which likely prevented the forced sale of real property that Shana and Brett eventually acquired as the sole beneficiaries of the Trust. We are *not* saying that Shana and Brett engaged in any sort of "tax gamesmanship", Janis v. Commissioner, 461 F.3d at 1087, but we do reaffirm the principle that "'a taxpayer may not, after taking a position in one year to his advantage and after correction for that year is barred, shift to a contrary position touching the same fact or transaction'", id. at 1086 (quoting Estate of Ashman, 231 F.3d at 543); see also LeFever, 103 T.C. at 543 ("A taxpayer in this situation, innocent or otherwise, who has already had the advantage of a past alleged misstatement--such advantage now beyond recoupment--may not change his posture and, by claiming he should have properly paid more tax before, avoid the

**[\*34]** present levy."). Thus, even if Shana and Brett could rely on Revenue Ruling 54-97, supra, and that revenue ruling could trump the Code's unambiguous language, the duty of consistency estops them from rebutting even by clear and convincing evidence the section 2032A value of the Ranch Interest.

V.    Penalties

Section 6662(a) imposes a 20% accuracy-related penalty on the portion of any underpayment attributable to one of five causes specified in subsection (b). The Commissioner argues for imposing the penalty on both of the couples based on two of those five causes:  Negligence or intentional disregard of rules or regulations, or a substantial understatement of income tax.  See sec. 6662(b)(1) and (2).  Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code.  Sec. 6662(c).  We have said that "'[n]egligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'"  Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991).  A substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec.

**[\*35]** 6662(d)(1)(A). The Commissioner bears the burden of production, see sec. 7491(c), which requires him "'only to come forward with evidence regarding the appropriateness of applying a particular addition to tax or penalty to the taxpayer'", Good v. Commissioner, T.C. Memo. 2008-245, 2008 WL 4756483, at \*9 (quoting Weir v. Commissioner, T.C. Memo. 2001-184). We will focus on negligence.

We find that the Commissioner has met his burden of production. Before filing his individual return, Brett received a K-1 generated from the Trust return showing over $350,000 of capital gain. He and his wife were well aware of the conservation-easement sale that created this capital gain, but they failed to report any of it on their return--a decision we find contrary to what a reasonable and ordinarily prudent person would do under the circumstances.

It's a similar story for the Tomlinsons. Before filing their return, they received two K-1s for Shana from the Trust--the original one showing over $350,000 of capital gain, and an amended one showing over $300,000. They too, however, failed to report any of that gain on their individual return. They too knew about the sale of the conservation easement.

Once the Commissioner has met his burden, taxpayers must come forward with persuasive evidence that the Commissioner's determination is incorrect.

**[\*36]** Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-47 (2001). Both siblings argue that they shouldn't be liable for any penalty because that gain stemmed from a value that they in good faith believed to be wrong after they consulted with their CPA, Paul Simmons, whose advice was that the cost basis reported for the conservation easement sale was way off.

Taxpayers can avoid the penalty if they show they acted with reasonable cause and in good faith. <u>See</u> sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs. We look at all relevant facts and circumstances--the most important of which is the extent of the taxpayers' effort to assess their proper tax liability--to decide if they did. <u>See</u> sec. 1.6664-4(b)(1), Income Tax Regs. Using somewhat circular reasoning, the regulation says that reliance on professional advice can establish reasonable cause and good faith "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." <u>Id.</u> Caselaw says that the siblings must prove three things to establish reasonable reliance:

- that Simmons was a competent professional who had sufficient expertise to justify reliance;

- that they provided him with necessary and accurate information; and

- that they actually relied in good faith on his judgment.

**[\*37]** <u>See</u> <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002); <u>see also</u> <u>Charlotte's Office Boutique, Inc. v. Commissioner</u>, 425 F.3d 1203, 1212 n.8 (9th Cir. 2005) (quoting with approval the three-prong test), <u>aff'g</u> 121 T.C. 89 (2003).  Assuming that they met the first two elements, both the Van Alens and the Tomlinsons fail on the third:  They weren't relying on Simmons's advice when they filed their returns:  Neither sibling presented any evidence that he or she sought out--much less relied on--any professional advice on the capital gain issue before filing.  Simmons credibly testified that they did not seek him out until November 2009, over a year after the Van Alens and the Tomlinsons filed their returns.  We therefore sustain the

**[\*38]** Commissioner's determination to impose the section 6662(a) accuracy-related penalty for failing to report the capital gain.[29]

Decisions will be entered for

respondent.

---

[29] The Van Alens also received two 1099-INT statements from Wells Fargo reporting $924 of interest income, which they failed to report. Shana likewise received a 1099-MISC from Ogle Productions, Inc., for $15,000 that she failed to report. Negligence is "strongly indicated" where a taxpayer fails to report on his income tax return an amount of income shown on an information return such as a 1099. See sec. 1.6662-3(b)(1)(i), Income Tax Regs. Neither couple provided any explanation of why they failed to report this income. We therefore also uphold the section 6662(a) accuracy-related penalty for portions of the underpayments due to these smaller omissions.