T.C. Memo. 2015-55

UNITED STATES TAX COURT

JERRY A. SAWYER AND KATIE L. SAWYER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19412-12.                    Filed March 24, 2015.

Troy Renkemeyer, for petitioners.

Randall L. Eager, Jr., and Douglas S. Polsky, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  By notice of deficiency (notice), respondent determined
deficiencies in Federal income tax of $89,006 and $60,286 and accuracy-related
penalties of $17,801 and $12,057 for petitioners' tax years 2008 and 2009,
respectively.

**[\*2]**  The parties have resolved most of the issues giving rise to the deficiencies.[1]

The issues remaining for decision are whether petitioners (1) underreported gross

receipts by \$285,975 on Schedule C attached to their Form 1040, U.S. Individual

Income Tax Return, for tax year 2008, (2) are entitled to reduce Schedule C gross

receipts by \$52,550 for costs of goods sold--labor for tax year 2008, and (3) are

liable for the section 6662(a)[2] accuracy-related penalty for both years.

## FINDINGS OF FACT

Petitioners, husband and wife, resided in Missouri at the time they filed

the petition.[3]  Petitioners are cash method taxpayers who make their return on the

calendar year basis.

---

[1]By stipulation of facts, the parties have stipulated certain adjustments to Mr. Sawyer's 2008 expenses reported on Schedule C, Profit or Loss From Business (Sole Proprietorship), set forth in greater detail infra.  The parties have also stipulated that there is a deficiency of \$30,647 for tax year 2009.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]The parties stipulated that petitioners resided in Overland Park, Kansas, at the time they filed the petition.  In the petition, however, petitioners declared an address in Buckner, Missouri.  The Missouri address is the same address petitioners used in their tax returns and is their address of record with the Court.  Overland Park appears to be the address of petitioners' counsel.  The Court will disregard the stipulation as inconsistent with the petition.  See Rule 91(a); see also Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195-196 (1989).

[*3]    During the years in issue Mr. Sawyer owned and operated an asphalt paving business known as Alan's Asphalt. Alan's Asphalt is a sole proprietorship, the income and expenses of which petitioners reported on Schedules C for the years in issue. Mr. Sawyer's full name is Jerry Alan Sawyer, and he seems to use either or both names throughout the documents.

Alan's Asphalt provided paving and repair services for businesses and individuals. Mr. Sawyer managed business operations, including negotiation of most of the contracts for projects and handling the company's finances. Mr. Sawyer performed much of the labor himself, particularly when it involved the use of grading equipment and other heavy machinery but also hired day laborers. Mrs. Sawyer, petitioners' adult son, and Mr. Sawyer's brother all routinely provided assistance to the business as well.

Alan's Asphalt serviced a wide geographic area including Florida and much of the Midwest, and Mr. Sawyer traveled frequently for work. Consequently, Alan's Asphalt did not retain a permanent labor crew but instead hired day laborers on a short-term basis whenever he arrived in a new city. These individuals were paid in cash at the end of each day, usually $100 but not more than $200, depending on their skills and the work involved in a given project.

**[*4]** Alan's Asphalt did not issue any Forms 1099-MISC, Miscellaneous Income, to the laborers.

Clients of Alan's Asphalt generally paid Mr. Sawyer by cash or check. Petitioners' banks did not maintain branches in many of the cities Mr. Sawyer visited, but Mr. Sawyer frequently required cash on hand to pay laborers and other business expenses incurred on the job. When a client paid Alan's Asphalt by check, Mr. Sawyer would take the check to a local bank, where he would convert it into one or more cashier's checks while retaining a portion of the funds as cash. Mr. Sawyer would later deposit the cashier's checks and any remaining cash into his and Mrs. Sawyer's personal bank accounts.

Petitioners filed a joint return for tax year 2008. On that return they reported adjusted gross income of $43,605, zero taxable income, and total tax owed of $6,628. Petitioners' adjusted gross income consisted of taxable interest of $12 and business income from Alan's Asphalt of $46,907. On Schedule C for Alan's Asphalt petitioners reported gross receipts or sales of $375,850 and cost of goods sold totaling $205,890 and claimed business expense deductions totaling $123,053. The cost of goods sold comprised claimed purchases of $153,340 and labor costs of $52,550.

[*5]   Petitioners filed a joint return for tax year 2009 on which they reported adjusted gross income of $45,284, zero taxable income, and total tax owed of $6,883.  Petitioners' adjusted gross income consisted of taxable interest of $16 and business income from Alan's Asphalt of $48,710.  On Schedule C for Alan's Asphalt petitioners reported gross receipts or sales of $266,867 and cost of goods sold totaling $135,788 and claimed business expense deductions totaling $82,369.

Respondent's revenue agent, Lisa DuPont (RA DuPont), examined petitioners' returns and, because she could not reconcile the amounts reported on petitioners' returns with the books and records of Alan's Asphalt, requested copies of petitioners' bank records.  RA DuPont reviewed petitioners' bank records and completed a bank deposits analysis based on her review of all of the deposits made into petitioners' bank accounts during the 2008 and 2009 tax years.

On the basis of the bank deposits analysis RA DuPont concluded that petitioners had deposited $327,602 into their bank accounts during 2008 and that those deposits constituted gross income derived from the business activities of Alan's Asphalt.  RA DuPont also reviewed 27 customer invoices that Mr. Sawyer had prepared on behalf of Alan's Asphalt.  The invoices reported amounts received for paving jobs as follows:

| [*6] Date | Customer Name | Amount |
|---|---|---|
| Mar. 3, 2008 | Lake House Inn | $7,250 |
| Mar. 4, 2008 | Feweil's Automotive | 17,800 |
| Mar. 20, 2008 | Floyd Kurzwell | 2,220 |
| Apr. 1, 2008 | Dirty Duck Bar and Grill | 8,400 |
| Apr. 3, 2008 | Hwy 5 Storage | 2,300 |
| Apr. 8, 2008 | Midwest Kennel | 2,300 |
| Apr. 9, 2008 | Greg Miller | 4,500 |
| Apr. 14, 2008 | Ernest Rogers | 7,000 |
| Apr. 15, 2008 | Robert Brewington | 5,000 |
| Apr. 17, 2008 | Melvin Phipps | 2,000 |
| May 2, 2008 | Aspen Lawn & Landscape | 9,140 |
| June 7, 2008 | Mary and Earl Weddel | 13,000 |
| June 11, 2008 | Swim Things, Inc. | 9,000 |
| June 23, 2008 | K&M Ranch House Restaurant | 8,500 |
| June 25, 2008 | Harrell Ridley Farms | 2,750 |
| July 18, 2008 | H&K Trucking, LLC | 8,024 |
| July 22, 2008 | H&K Trucking, LLC | 12,544 |
| July 22, 2008 | Metcalf Excavating | 46,000 |
| July 22, 2008 | Dave Tonder | 70,000 |
| Aug. 12, 2008 | Doug Teters | 8,600 |
| Aug. 14, 2008 | Mervil Mullenay | 4,900 |
| Aug. 17, 2008 | Louise Forster | 19,300 |
| Aug. 20, 2008 | Western Implement Co., Inc. | 31,380 |

| | | |
|---|---|---:|
| **[*7]** Aug. 22, 2008 | n/a | 3,000 |
| Aug. 28, 2008 | Smith Farms | 28,800 |
| Oct. 27, 2008 | Jim Crowley | 1,350 |
| Oct. 27, 2008 | Jim Crowley | 4,366 |
| Total | | 339,424 |

Because of Mr. Sawyer's spotty recordkeeping and haphazard method of depositing customer payments, with certain minor exceptions RA DuPont was unable to link the invoices to specific entries on the bank deposits analysis.[4] She concluded that the amounts on the invoices represented separate items of income and increased the gross receipts of Alan's Asphalt by $334,224 for 2008. Adding the gross receipts from the invoices to the $327,602 of deposited funds, RA DuPont determined that Alan's Asphalt received total gross receipts of $661,826 and that petitioners had therefore underreported Alan's Asphalt's gross receipts by $285,975. RA DuPont also concluded that petitioners were not entitled to deductions for a number of other items reported on the returns, including the

[4]RA DuPont was able to link $1,000 of the proceeds from the Kurzwell invoice and $3,600 of the proceeds from the Aspen Lawn & Landscape invoice to specific deposits in her bank deposits analysis. The Lake House Inn invoice states that $600 of the payment would be provided in the form of one month's rent. RA DuPont disregarded this amount on the grounds that petitioners would have been entitled to a deduction for the same amount. The invoice total was reduced by these amounts, and the gross receipts of Alan's Asphalt was increased by the remaining $334,224 instead of the original total of $339,424.

**[*8]** $52,550 of labor costs for 2008. RA DuPont performed a similar analysis for the 2009 tax year and determined that petitioners had underreported the gross receipts of Alan's Asphalt by $136,808 and had overstated certain other deductions and costs for that year.

Following a review of RA DuPont's adjustments to petitioners' 2008 and 2009 income by the Internal Revenue Service Appeals Office, respondent issued the notice. Respondent determined deficiencies of $89,006 and $60,286 for tax years 2008 and 2009, respectively and section 6662(a) accuracy-related penalties of $17,801 and $12,057 for 2008 and 2009, respectively. The deficiencies reflected, among other adjustments, the determination that petitioners had underreported the gross receipts of Alan's Asphalt by $285,975 and the denial of the claimed deductions for $52,550 of labor costs for tax year 2008.

Petitioners timely filed a petition with this Court. The parties have stipulated that the following adjustments to petitioners' 2008 Schedule C were correct and proper:

| Item | Amount[1] |
|------|------|
| Office expenses | $500 |
| Insurance | 5,170 |
| Utilities | 2,400 |

| | |
|---|---|
| [*9] Supplies | (7,485) |
| Repairs | 38 |
| Travel | 3,287 |
| Car & truck | 6,289 |
| Cost of goods sold--purchases | (60,718) |
| Advertising | -0- |
| Rent/lease | -0- |
| Other expenses | -0- |
| Depreciation | -0- |
| Meals & entertainment | -0- |

[1]These figures represent downward adjustments to reflect respondent's disallowance of expenses and costs reported on Schedule C. The adjustments in parenthesis are positive adjustments; that is, respondent agrees that petitioners substantiated certain expenses in addition to those reported on the original return.

Because the parties have also stipulated that there is a deficiency in tax due from petitioners of $30,647 for tax year 2009, matters from 2009 will not be discussed any further.

OPINION

I. Unreported Income

A. Burden of Proof

Ordinarily, the burden of proof is upon the taxpayer. See Rule 142(a). This case involves unreported income, however, and, in such case, we require the

[*10] Commissioner to provide a minimal evidentiary foundation supporting his determination of unreported income or else the burden of going forward with the evidence with respect to the unreported income shifts to him. See, e.g., Day v. Commissioner, 975 F.2d 534, 537 (8th Cir. 1992), aff'g in part, rev'g in part on other grounds T.C. Memo. 1991-140; see also Mohler v. Commissioner, T.C. Memo. 2014-90, at *4.

Respondent determined that the bank deposits and the amounts on the invoices constitute separate items of income for 2008. Petitioners contend that respondent should bear the burden of proof with respect to the unreported gross receipts attributable to the invoices, arguing that respondent "has provided ZERO evidence that any revenue related to the invoices/bids on its list was received other than the amounts that are reflected in the deposit analysis."

Petitioners are mistaken. Respondent has introduced evidence showing that Mr. Sawyer routinely failed to deposit the proceeds from asphalt paving jobs. Mr. Sawyer admitted at trial and petitioners admit on brief that Mr. Sawyer performed nearly all of the asphalt paving jobs set forth in the invoices but that for many of those jobs they failed to deposit some portion of the proceeds received. Respondent has satisfied his burden to provide a minimal evidentiary foundation

[*11] supporting his determination of unreported income. The burden of proof remains upon petitioners.

B.    Bank Deposits

Section 61(a)(2) defines gross income as all income from whatever source derived, including gross income derived from business. Persons subject to tax are required to keep records sufficient to establish gross income and deductions. See sec. 6001; see also sec. 1.6001-1(a), Income Tax Regs. Where a taxpayer fails to maintain adequate records, the Commissioner is authorized to compute the taxpayer's income by any method which clearly reflects income. See sec. 446(b); see also Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989).

Respondent relied, in part, on the so-called bank deposits method to reconstruct petitioners' income. This Court has long recognized the bank deposits method as a reasonable means of reconstructing a taxpayer's income. See, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Deposits in a taxpayer's bank account are considered prima facie evidence of income. Id. The bank deposits method assumes that all money deposited into a taxpayer's bank account during a particular period constitutes taxable income, and the taxpayer bears the burden of showing that the deposits were not taxable income but were derived from a

[*12] nontaxable source.  Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), aff'g T.C. Memo. 1998-121.

Relying on RA DuPont's bank deposits analysis, respondent determined that petitioners had deposited $327,602 into their bank accounts during 2008 and that those funds represent gross receipts attributable to Alan's Asphalt.  Petitioners do not dispute respondent's reliance on the bank deposits method.  Petitioners contend that one item listed in respondent's analysis, a March 24, 2008, deposit of $9,960, represents a dishonored check that was subsequently reissued and deposited at a later date.  Respondent concedes that the $9,960 deposit does not represent taxable income.  The Court accepts respondent's concession and will reduce petitioners' gross income attributable to taxable deposits accordingly.  The Court finds that petitioners deposited $317,642[5] into their bank accounts during 2008 and that those deposits represent gross receipts of Alan's Asphalt.

C.    Invoices

1.    Overview

Respondent determined that, in addition to the $317,642 of gross receipts represented by the bank deposits, Alan's Asphalt received gross receipts totaling $334,224 in connection with 27 customer invoices.  Petitioners contend that

_____

[5]This amount reflects the bank deposits reduced by the dishonored check.

[*13] respondent's determination severely overstates in a variety of ways the gross receipts that Alan's Asphalt received during 2008.

First, petitioners argue that not all of the invoices represent actual asphalt paving jobs for which Alan's Asphalt was hired and paid. Specifically, petitioners identify two invoices that should be excluded: the unsigned invoice dated August 22, 2008, for $3,000 and the Jim Crowley invoice dated October 27, 2008, for $1,350. These invoices, petitioners contend, merely represent unsuccessful bids for asphalt paving jobs. No work was performed in connection with the invoices, and no money was received. Respondent does not dispute petitioners' explanation and concedes that Alan's Asphalt did not receive payment with respect to those two invoices. Accordingly, these amounts should not be included in the gross receipts of Alan's Asphalt.

With respect to the remaining 25 invoices, petitioners admit that Alan's Asphalt received payment as stated on the invoices. Consequently, the amount stated in each of the remaining invoices constitutes gross receipts to Alan's Asphalt. See sec. 61(a). Petitioners contend, however, that Mr. Sawyer deposited most of the proceeds of each asphalt paving job into petitioners' bank accounts, either in cash or cashier's checks in the manner described. See supra p. 4. Thus, petitioners argued that respondent has twice included the proceeds of those asphalt

**[\*14]** paving jobs in gross receipts: first by including the amounts stated in the invoice and a second time by including the deposited funds in the bank deposits analysis. Petitioners argue that where the proceeds of a given invoice were deposited into one of the bank accounts, these funds have been duly accounted for in respondent's bank deposits analysis and should not be included in gross receipts a second time.

The Court agrees that the proceeds from the asphalt paving jobs should not be included in gross receipts twice, but we cannot simply disregard the invoices as duplicative. Petitioners bear the burden of proof in this case. See supra part I.A. Moreover, petitioners concede that Alan's Asphalt received, but Mr. Sawyer failed to deposit, significant amounts of cash in connection with the invoices.[6] To the extent that petitioners can demonstrate a link between the proceeds from an invoice and a specific deposit in the bank deposits analysis, the Court agrees that these funds have been duly accounted for and should not be included in gross

---

[6]Petitioners argue that in any instance where cash was received in connection with an invoice but not deposited into a bank account, those funds were spent on labor costs or other expenses. Petitioners concede that those proceeds should be included in gross receipts but argue that they are entitled to a commensurate reduction for cost of goods sold or a business expense deduction. The Court addresses the cost of goods sold issue separately. See infra part II.

[*15] receipts a second time. The Court addresses each of these outstanding invoices below.

### 2. Analysis of Invoices

#### a. Lake House Inn

Respondent determined that petitioners received unreported gross receipts of $6,650[7] in connection with the March 3, 2008, invoice issued to Lake House Inn. Respondent concedes that petitioners have demonstrated that $6,000 of the proceeds was deposited into their bank accounts. Petitioners admit that Alan's Asphalt received the remaining $650 in cash but did not deposit those funds. Accordingly, the Court finds that Alan's Asphalt received additional unreported gross receipts of $650 in addition to the $6,000 that has already been accounted for in respondent's bank deposits analysis in connection with the Lake House Inn invoice.

#### b. Feweil's Automotive

Petitioners admit that Alan's Asphalt received $17,800 in connection with the March 4, 2008, invoice issued to Feweil's Automotive. Respondent concedes that petitioners have demonstrated that $16,460 of the proceeds was deposited into

---

[7]This amount reflects the invoice amount of $7,250 reduced by the $600 rent credit.

[*16] petitioners' bank accounts. Petitioners admit that Alan's Asphalt received the remaining $1,340 in cash but did not deposit those funds into petitioners' bank accounts. Accordingly, the Court finds that Alan's Asphalt received additional unreported gross receipts of $1,340 in addition to the $16,460 that has already been accounted for in respondent's bank deposits analysis in connection with the Feweil's Automotive invoice.

### c. Floyd Kurzwell

Petitioners admit that Alan's Asphalt received $2,220 in connection with the March 20, 2008, invoice issued to Floyd Kurzwell. Respondent concedes that petitioners have demonstrated that $1,000 of the proceeds from that project was deposited into petitioners' bank accounts. Petitioners concede that Alan's Asphalt received the remaining $1,220 in cash but did not deposit those funds into petitioners' bank accounts. Accordingly, the Court finds that Alan's Asphalt received additional unreported gross receipts of $1,220 in addition to the $1,000 that has already been accounted for in respondent's bank deposits analysis in connection with the Kurzwell invoice.

### d. Dirty Duck Bar and Grill

Petitioners admit that Alan's Asphalt received $8,400 in connection with the April 1, 2008, invoice issued to Dirty Duck Bar and Grill. Respondent concedes

[*17] that petitioners have demonstrated that $8,300 of the proceeds from that project was deposited into petitioners' bank accounts. Petitioners admit that Alan's Asphalt received the remaining $100 in the form of food and drinks, which Mr. Sawyer provided to the laborers. Petitioners concede that this receipt constitutes bartered services income, see sec. 1.61-2(d)(1), Income Tax Regs., but argue that they are entitled to a business expense deduction for meals and entertainment in the same amount.

Respondent objects to the Court's allowing the deduction. Respondent does not allege that Alan's Asphalt did not receive the food and drinks, nor does he argue that Mr. Sawyer did not provide the refreshments to his laborers. Rather, respondent contends that we should not consider petitioners' argument because they raised it for the first time in their opening brief. Respondent also argues that the parties have stipulated the amount of meals and entertainment expenses to which they were entitled for 2008.

As a general rule, this Court will not consider issues raised by a party for the first time on brief when to do so will prevent the opposing party from presenting evidence or arguments that might have been offered had the issue been timely raised. See, e.g., Graham v. Commissioner, 79 T.C. 415, 423 (1982); Boehme v. Commissioner, T.C. Memo. 2003-81, 2003 WL 1392720, at *4. Mr. Sawyer

**[\*18]** testified at trial that he received the refreshments as partial payment on the Dirty Duck Bar and Grill invoice, and respondent has accepted Mr. Sawyer's testimony. Respondent had the opportunity to address the deductibility of the refreshments in his reply brief but declined to do so. The Court does not believe that respondent has been prejudiced by petitioners' raising the matter on their opening brief.

Nor does the Court believe that the parties' stipulation precludes petitioners from arguing that they are entitled to the deduction. Stipulations are treated "as * * * conclusive admission[s] by the parties". See Rule 91(e); Chapman Glen Ltd. v. Commissioner, 140 T.C. 294, 317 (2013). Under Rule 91(e), the Court may relieve parties of a stipulation if justice so requires. For example, the Court may relieve parties of a stipulation which is contrary to the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989); see also Crawford v. Commissioner, T.C. Memo. 2014-156, at \*17. Petitioners did not claim any deduction for meals and entertainment expenses on Schedule C for Alan's Asphalt. The parties stipulated that respondent's adjustments to the reported Schedule C expenses, including no adjustment to the meals and entertainment expenses, were correct. Petitioners introduced evidence that the stipulation was plainly incorrect, and respondent does not dispute the validity of that evidence.

[*19] The Court will therefore relieve petitioners of their stipulation for the allowable $100 meals and entertainment expense for 2008.

Accordingly, the Court finds that Alan's Asphalt received additional unreported barter income of $100 in addition to the $8,300 that has already been accounted for in respondent's bank deposits analysis in connection with the Dirty Duck Bar and Grill invoice. The Court also finds that Alan's Asphalt is entitled to an additional deduction for meals and entertainment expenses of $100.

### e. Hwy 5 Storage

Petitioners admit that Alan's Asphalt received $2,300 in connection with the April 3, 2008, invoice issued to Hwy 5 Storage and that those funds were not deposited into petitioners' bank accounts. Accordingly, the Court finds that Alan's Asphalt received additional unreported gross receipts of $2,300 in connection with the Hwy 5 Storage invoice.

### f. Midwest Kennel

Petitioners admit that Alan's Asphalt received $2,300 in connection with the April 8, 2008, invoice issued to Midwest Kennel and that those funds were not deposited into petitioners' bank accounts. Accordingly, the Court finds that Alan's Asphalt received additional unreported gross receipts of $2,300 in connection with the Midwest Kennel invoice.

**[*20]**             g.      <u>Greg Miller</u>

Petitioners admit that Alan's Asphalt received $4,500 in connection with the April 9, 2008, invoice issued to Greg Miller. Respondent concedes that petitioners have demonstrated that $3,825 of the proceeds from that project was deposited into petitioners' bank accounts. Petitioners concede that the remaining $675 was not deposited into petitioners' bank accounts. Accordingly, the Court finds that Alan's Asphalt received additional unreported gross receipts of $675 in addition to the $3,825 that has already been accounted for in respondent's bank deposits analysis in connection with the Miller invoice.

h.      <u>Ernest Rogers</u>

Petitioners admit that Alan's Asphalt received $7,000 in connection with the April 14, 2008, invoice issued to Ernest Rogers. Respondent concedes that petitioners have demonstrated that $5,150 of the proceeds from that project was deposited into petitioners' bank accounts. Petitioners concede that Alan's Asphalt received the remaining $1,850 in cash but claim that those funds were not deposited into petitioners' bank accounts. Accordingly, the Court finds that Alan's Asphalt received additional unreported gross receipts of $1,850 in addition to the $5,150 that has already been accounted for in respondent's bank deposits analysis in connection with the Rogers invoice.

**[*21]**　　　　　　i.　　Robert Brewington

Petitioners admit that Alan's Asphalt received $5,000 in connection with the April 15, 2008, invoice issued to Robert Brewington. Respondent concedes that petitioners have demonstrated that $4,800 of the proceeds from that project was deposited into petitioners' bank accounts. Petitioners admit that Alan's Asphalt received the remaining $200 in cash but that those funds were not deposited into petitioners' bank accounts. Accordingly, the Court finds that Alan's Asphalt received additional unreported gross receipts of $200 in addition to the $4,800 that has already been accounted for in respondent's bank deposits analysis in connection with the Brewington invoice.

　　　　　　j.　　Melvin Phipps

Petitioners admit that Alan's Asphalt received $2,000 in connection with the April 17, 2008, invoice issued to Melvin Phipps. Petitioners acknowledge that the proceeds from this project were paid in cash and that they did not deposit that cash into their bank accounts. Accordingly, the Court finds that Alan's Asphalt received additional unreported gross receipts of $2,000 in connection with the Phipps invoice.

**[\*22]**          k.          <u>Aspen Lawn & Landscape</u>

Petitioners admit that Alan's Asphalt received $9,140 in connection with the May 2, 2008, invoice issued to Aspen Lawn & Landscape. Respondent determined that $3,600 of the proceeds from that asphalt paving job was deposited into petitioners' bank accounts. Petitioners contend that a check deposited on May 5, 2008, for $1,450 and cash deposits of $3,000 on May 6, 2008, and $1,200 on May 16, 2008, are also attributable to the Aspen Lawn & Landscape invoice. Petitioners did not provide any documentation or other evidence to support this claim. Nonetheless, the Court is satisfied by petitioner's testimony as well as the timing and amount of the May 6 cash deposit that the $3,000 represents proceeds attributable to the Aspen Lawn & Landscaping invoice. The Court finds that petitioners have demonstrated that an additional $3,000 of the proceeds was deposited into their bank accounts. Petitioners have failed to satisfy their burden of proof with respect to the remaining funds, however, and the Court sustains respondent's determination as to the undeposited $2,540. Accordingly, the Court determines that Alan's Asphalt received additional unreported gross receipts of $2,540 in addition to the $6,600 that has already been accounted for in respondent's bank deposits analysis.

**[\*23]**              l.       <u>Mary and Earl Weddel</u>

Petitioners admit that Alan's Asphalt received $13,000 in connection with the June 7, 2008, invoice issued to Mary and Earl Weddel. The invoice provides that the funds were "[t]o be paid upon satisfactory completion" of the work. Mr. Sawyer credibly testified at trial that he received payment in the form of a single check, and petitioners contend on brief that the $13,000 check deposited into their bank account on September 23, 2008, represents the proceeds of this project. The Court is satisfied with petitioners' explanation and finds that the proceeds of the Weddel invoice were included in respondent's bank deposits analysis. No further adjustment to the gross receipts of Alan's Asphalt with respect to the Weddel invoice is appropriate.

              m.     <u>Swim Things, Inc.</u>

Petitioners admit that Alan's Asphalt received $9,000 in connection with the June 11, 2008, invoice issued to Swim Things, Inc., a company based in Blue Springs, Missouri. At trial Mr. Sawyer testified that he was paid by check, which he then converted to a cashier's check and cash. Respondent's bank deposits analysis indicates two deposits on June 11, 2008, totaling $4,000, and the annotation "cashier's check from Alan to Alan from Bank of the West--Blue Springs, MO." Petitioner also deposited $1,000 in cash that same day. The Court

[*24] finds these details sufficient to establish that the $5,000 petitioners deposited into their bank accounts on June 11, 2008, was proceeds from the Swim Things, Inc. invoice. Petitioners have failed to show that they deposited the remaining $4,000 attributable to this project. The Court therefore sustains respondent's determination that Alan's Asphalt received additional unreported gross receipts of $4,000 in addition to the $5,000 that has already been accounted for in respondent's bank deposits analysis in connection with the Swim Things, Inc. invoice.

### n. K&M Ranch House Restaurant

Petitioners admit that Alan's Asphalt received $8,500 in connection with the June 23, 2008, invoice issued to K&M Ranch House Restaurant. At trial Mr. Sawyer testified that he received payment in the form of four checks totaling $5,739, plus cash of $2,600 (on brief petitioners asserted the cash retained was $2,761). Petitioners admit on brief that the cash received in connection with the K&M Ranch House invoice was not deposited. Petitioners assert, however, that certain entries on respondent's bank deposits analysis represent the four checks allegedly received as payment from K&M Ranch House. Each of those entries bears an annotation by RA DuPont, indicating the name of the maker of the check. Notably, none of those names include K&M Ranch House or its owner Karolyn

**[\*25]** Lyon, and petitioners have provided no explanation for this discrepancy. Petitioners have not satisfied their burden of proof. The Court sustains respondent's determination that Alan's Asphalt received unreported additional gross receipts of $8,500 with respect to the K&M Ranch House invoice.

> o.    Harrell Ridley Farms

Petitioners admit that Alan's Asphalt received $2,750 in connection with the June 25, 2008, invoice issued to Harrell Ridley Farms. The invoice bears a handwritten note indicating that the invoice was "paid in full" by check. At trial Mr. Sawyer testified that he received a wire transfer of $2,600, less $150 for banking fees. On brief petitioners claimed that they received a wire transfer of $2,600 on July 3, 2008, plus $150 in cash. In view of petitioners' inconsistent claims, neither of which is supported by documentation or other evidence, the Court concludes that petitioners have not satisfied their burden of proof with respect to the Harrell Ridley Farms invoice. The Court sustains respondent's determination that Alan's Asphalt received additional unreported gross receipts of $2,750 with respect to the Harrell Ridley Farms invoice.

> p.    H&K Trucking, LLC

Alan's Asphalt issued two invoices to H&K Trucking, LLC, during 2008. The first invoice is dated July 18, 2008, and is for $8,024. The second, dated July

[*26] 22, 2008, is for $12,544. The first invoice bears a handwritten note that it has been "paid in full" and references a check number. The second, though lacking a "paid in full" note, indicates that it was also paid by check. Petitioners admit that they "[do] not recall the specifics" of these payments. Accordingly, petitioners have failed to satisfy their burden of proof, and the Court sustains respondent's determination that Alan's Asphalt received additional unreported gross receipts of $8,024 and $12,544 in connection with the two H&K Trucking invoices.

### q. Metcalf Excavating

Petitioners admit that Alan's Asphalt received $46,000 in connection with the July 22, 2008, invoice issued to Metcalf Excavating reflecting Mike Metcalf as owner. Mr. Sawyer testified that he received a check for $6,500 from Leroy Latham as payment toward this invoice as well as eight cash payments totaling $27,820 between July 17 and December 23, 2008. On brief petitioners altered their explanation and claimed that they received three checks: the $6,500 check from Mr. Latham plus a check from "Ritchie Bros--Lincoln, NE" for $5,720 and a check from Jim Kauffman for $6,300. Petitioners' claim is undermined by Mr. Sawyer's notes on the Metcalf Excavating invoice, which state that the invoice was paid by two checks for $10,000 and $36,000, respectively. Respondent's

**[\*27]** bank deposits analysis does not reflect that petitioners deposited checks in those amounts during 2008. Petitioners have failed to satisfy their burden of proof with respect to the Metcalf Excavating invoice, and the Court sustains respondent's determination that Alan's Asphalt received additional unreported gross receipts of $46,000 in connection with the Metcalf Excavating project.

### r.     Dave Tonder

Petitioners admit that Alan's Asphalt received $70,000 in connection with the July 22, 2008, invoice issued to Dave Tonder. According to Mr. Sawyer's handwritten notes on the invoice, Mr. Tonder paid by two checks: one for $17,500 and, "upon satisfactory completion," another for $52,500. Petitioners identify a $17,575 deposit on respondent's bank deposits analysis that they allege represents Mr. Tonder's downpayment, and the Court believes the evidence supports petitioners' claim. At trial Mr. Sawyer testified that the $52,500 balance was actually paid in three installments over the course of the asphalt paving job but was unspecific as to the amounts or the timing of the deposits. The Court is unable to identify which deposits, if any, correspond with the remaining payments. Consequently, petitioners have failed to satisfy their burden of proof as to the $52,425 balance, and the Court sustains respondent's determination that Alan's Asphalt received additional unreported gross receipts of $52,425 in addition to the

[*28] $17,575 that has already been accounted for in respondent's bank deposits analysis in connection with the Tonder invoice.

### s.  Doug Teters

Petitioners admit that Alan's Asphalt received $8,600 in connection with the August 12, 2008, invoice issued to Doug Teters.  Respondent concedes that petitioners have demonstrated that $3,500 of the proceeds from that project was deposited into petitioners' bank accounts.  Petitioners admit that the remaining $5,100 was received as cash but was not deposited into petitioners' bank accounts.  Accordingly, the Court finds that Alan's Asphalt received additional unreported gross receipts of $5,100 in addition to the $3,500 that has already been accounted for in respondent's bank deposits analysis in connection with the Teters invoice.

### t.  Mervil Mullenay

Alan's Asphalt issued an invoice to Mervil Mullenay dated August 14, 2008, for $4,900.  Petitioners admit that they "[do] not recall the specifics about this deposit."  Accordingly, petitioners have failed to satisfy their burden of proof, and the Court sustains respondent's determination that Alan's Asphalt received additional unreported gross receipts of $4,900 with respect to the Mullenay invoice.

**[\*29]**                    u.          <u>Louise Forster</u>

Petitioners admit that Alan's Asphalt received $19,300 in connection with the August 17, 2008, invoice issued to Louise Forster. A handwritten note on the invoice indicates that Ms. Forster initially paid $8,000 by check with the $11,300 balance due upon completion. Mr. Sawyer testified that the invoice was paid by an $11,000 cashier's check, a personal check from Edwin McElley for $6,400, and cash of $1,200. The Court is satisfied that the October 29, 2008, deposit of $11,000 represents proceeds from the Forster invoice and finds accordingly. Petitioners' claim with respect to the remaining $8,300 is inconsistent with the invoice and unsupported by other evidence. Petitioners have therefore failed to satisfy their burden of proof, and the Court sustains respondent's determination that Alan's Asphalt received additional unreported gross receipts of $8,300 in addition to the $11,000 that has already been accounted for in respondent's bank deposits analysis in connection with the Forster invoice.

                    v.          <u>Western Implement Co., Inc.</u>

Petitioners concede that they received $31,380 worth of equipment as payment for the August 20, 2008, invoice issued to Western Implement Co., Inc., and that that exchange constitutes taxable barter income under section 61(a). <u>See</u> sec. 1.61-2(d), Income Tax Regs.

[*30] Petitioners contend that they are entitled to a section 179 expense deduction of $31,380 with respect to the equipment received. Section 179(a) permits a taxpayer to elect to treat the cost of certain property as an expense for the taxable year in which the property is placed in service. To claim the benefit of section 179, the taxpayer must, among other requirements, make an irrevocable election on his or her tax return. See sec. 179(c). Petitioners raise this issue for the first time brief and, in any event, did not make the requisite election. The Court will deny the deduction.

Petitioners argue, in the alternative, that they are entitled to a depreciation expense deduction for the cost of the equipment. This issue, too, petitioners raise for the first time on brief and only in the most general terms. Moreover, the parties have stipulated the amount of depreciation expenses to which petitioners are entitled. The Court will not allow any further depreciation deduction. Accordingly, the Court sustains respondent's determination that Alan's Asphalt received additional unreported gross receipts of $31,380 in connection with the Western Implement Co., Inc. invoice.

w. Smith Farms

Petitioners admit that Alan's Asphalt received $28,800 in connection with the August 28, 2008, invoice issued to Smith Farms. On brief petitioners contend

**[*31]** that certain checks deposited into their bank accounts and included in respondent's bank deposits analysis were payments attributable to the Smith Farms invoices. In the bank deposits analysis RA DuPont's notes indicate that those checks were issued by Go Rentals, Inc., Jim Kauffman, and James Valerio. The Court does not find credible petitioners' claims that those checks were paid by or for the benefit of the owner Jerry Smith or Smith Farms. Petitioners have failed to satisfy their burden of proof with respect to the Smith Farms invoice, and the Court sustains respondent's determination that Alan's Asphalt received additional gross receipts of $28,800 in connection with the Smith Farms invoice.

x.     Jim Crowley

Petitioners admit that Alan's Asphalt received $4,366 in connection with the October 27, 2008, invoice issued to Jim Crowley and concede that they are unable to identify the funds in respondent's bank deposits analysis. The Court sustains respondent's determination that Alan's Asphalt received additional gross receipts of $4,366 in connection with the Crowley invoice. As previously discussed, the second October 27, 2008, invoice issued to Jim Crowley for $1,350 was an unsuccessful bid for an asphalt paving job and will not be included in the gross receipts of Alan's Asphalt.

**[*32]**              y.      Total Undeposited Gross Receipts

On the basis of our review of the invoices, respondent's bank deposits analysis, Mr. Sawyer's testimony at trial, and the parties' briefs, the Court concludes that Alan's Asphalt received but failed to deposit additional gross receipts totaling $232,264.

D.      Conclusion

During tax year 2008 Alan's Asphalt received gross receipts totaling $549,906, which consists of $317,642 deposited into petitioners' bank accounts and an additional $232,264 in undeposited gross receipts. On their 2008 return petitioners reported that Alan's Asphalt received gross receipts of $375,850. The Court concludes, therefore, that petitioners underreported the additional gross receipts of Alan's Asphalt by $174,056. Additionally, Alan's Asphalt is entitled to a business expense deduction for meals and entertainment of $100.

II.     Costs of Goods Sold--Labor

On Schedule C of their tax return for 2008 petitioners claimed that Alan's Asphalt incurred cost of goods sold totaling $205,890. This amount comprised purchases totaling $153,340 and labor costs of $52,550. In the notice respondent determined that Alan's Asphalt is entitled to an additional $60,718 for purchases for 2008 but disallowed the claimed labor costs in their entirety. Respondent

[*33] argues that petitioners are not entitled to the claimed labor costs because they have failed to establish that the costs were paid or incurred during the 2008 tax year or that any labor could have been completed by Mr. Sawyer or his family members without the assistance of any hired labor.

A taxpayer engaged in a manufacturing or merchandising business may subtract cost of goods sold from gross receipts to arrive at gross income. Sec. 1.61-3(a), Income Tax Regs.; see also sec. 1.162-1(a), Income Tax Regs. Cost of goods sold is the amount that the taxpayer expended to purchase or construct the inventory sold during the year. Kazhukauskas v. Commissioner, T.C. Memo. 2012-191, 2012 WL 2848694, at *9. Cost of goods sold is an offset to gross receipts for purposes of computing gross income, rather than a deduction, which is subtracted from gross income in arriving at taxable income. Id. The taxpayer bears the burden of substantiating the amount claimed as cost of goods sold, and it is the taxpayer's responsibility to maintain adequate books and records sufficient to substantiate all items on the tax return, including cost of goods sold. See sec. 6001; see also Said v. Commissioner, T.C. Memo. 2003-148, 2003 WL 21205252, at *3, aff'd, 112 Fed. Appx. 608 (9th Cir. 2004). Where a taxpayer does not have adequate records, but the record indicates that he or she clearly incurred an offset to gross income, the Court may estimate the offset on the basis of the evidence.

[*34] <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930); <u>see also</u> <u>Kazhukauskas v. Commissioner</u>, 2012 WL 2848694 at *9.  In estimating the amount allowable, however, the Court bears heavily against taxpayers whose inexactitude is of their own making.  <u>Cohan v. Commissioner</u>, 39 F.2d at 544.

Mr. Sawyer admitted that the figure submitted on Schedule C of petitioners' 2008 return was an approximation.  Mr. Sawyer testified that he typically hired two to three laborers per day and paid them $100 to $200 in cash at the end of each day.  He did not maintain any records to track his costs, and petitioners did not submit any evidence to corroborate this testimony.

The Court is not required to accept a taxpayer's unsubstantiated testimony, <u>see</u> <u>Tokarski v. Commissioner</u>, 87 T.C. at 77, and the Court is not convinced that what Mr. Sawyer admits is an estimate is sufficient to prove the claimed costs. Nevertheless, Mr. Sawyer provided credible testimony describing, inter alia, the process of laying asphalt, the manpower required, and his method of recruiting day laborers.  On the basis of Mr. Sawyer's testimony and the invoices in evidence, it is clear that petitioners are entitled to some offset for labor costs.

The Court found credible Mr. Sawyer's testimony that he hired two to three laborers per day for most of the asphalt paving jobs listed in the invoices and that he paid them cash at the end of the day.  Keeping in mind the admonition in <u>Cohan</u>

**[*35]** that we may bear heavily against the taxpayer whose inexactitude is of his own making, the Court will accept the low end of that range. The Court will therefore allow a labor cost reduction of two laborers at $100 per laborer per day.[8]

The Court is faced with some difficulty estimating the number of days for which petitioners are entitled to the labor costs. Mr. Sawyer testified that Alan's Asphalt relied on the hired labor "[f]rom the end of March probably until the weather gets bad", which, on brief, petitioners appear to explain as referring to the end of September. The Court accepts the period from March to September as the starting point for our analysis, but we find petitioners' assertion on brief that Alan's Asphalt hired laborers five days a week, every week, for six months to be unsupported by the evidence. The Court believes petitioners' estimate overstates the number of days during which Alan's Asphalt actually required labor and gives no regard to other necessary business activities, such as travel, negotiation of contracts, and other preparation.

---

[8]Mr. Sawyer's claim that he paid approximately $100 for 8 to 9 hours of work per day is consistent with figures released by the Bureau of Labor Statistics (BLS) for that period. BLS reports that in May 2008 the national median hourly wage for construction laborers was $13.71 and the national median hourly wage for paving, surfacing, and tamping equipment operators was $16. See May 2008 National Occupational Employment and Wage Estimates--United States, Bureau of Labor Statistics, http://www.bls.gov/oes/2008/may/oes_nat.htm (last visited Jan. 15, 2015).

[*36] Our analysis of the invoices in evidence reveals that the dates on the invoices generally tend to be clustered together, followed by periods during which Alan's Asphalt signed few to no new contracts. The Court surmises from this pattern that Mr. Sawyer likely spent several days procuring asphalt paving jobs, followed by a few weeks of performing those jobs. In the absence of additional evidence, the Court concludes that Alan's Asphalt did not incur any labor costs during the periods during which Mr. Sawyer negotiated asphalt paving jobs. The Court will therefore exclude from the estimate the weeks of March 3, March 31, April 7, April 14, June 9, June 23, July 21, August 11, August 18, and August 25.

After eliminating those weeks during which Mr. Sawyer negotiated asphalt paving jobs, the Court is left with approximately 105 days. The Court will also exclude from the estimate certain invoices that provide for smaller asphalt paving jobs. Specifically, the Court will not allow labor costs in connection with the Kurzwell invoice, the Phipps invoice, the Hwy 5 Storage invoice, the Midwest Kennel invoice, the Miller invoice, and the $4,366 Jim Crowley invoice. Each of those invoices involved the paving of a relatively smaller area and required little to no removal of existing material. The Court agrees with respondent that these tasks could have been accomplished by Mr. Sawyer and his family members without the assistance of additional hired labor. In the absence of evidence showing

[*37] otherwise, the Court concludes that petitioners are not entitled to labor costs with respect to those asphalt paving jobs and will remove one day from our approximation for each of the six invoices.

Applying the principle set forth in <u>Cohan</u>, then, the Court estimates that petitioners may claim a reduction against gross receipts for labor costs for two laborers per day at $100 per laborer per day for 99 days. The Court will therefore allow a reduction for labor costs of $19,800.

III.    <u>Section 6662(a) Penalties</u>

Section 6662(a) and (b)(1) and (2) provides for an accuracy-related penalty of 20% of the portion of any underpayment attributable to, among other things, negligence or intentional disregard of rules or regulations (without distinction, negligence) or any substantial understatement of income tax. The term "negligence" includes "any failure to make a reasonable attempt to comply with the provisions" of the Code or to exercise "ordinary and reasonable care in the preparation of a tax return." <u>See</u> sec. 1.6662-3(b)(1), Income Tax Regs. Negligence also includes "any failure by the taxpayer to keep adequate books and records or to substantiate items properly." <u>Id.</u> The term "disregard" includes "any careless, reckless, or intentional disregard." Sec. 6662(c).

**[*38]** Section 6664(c)(1) provides that the penalty shall not be imposed with respect to any portion of an underpayment if the taxpayer shows that there was reasonable cause for, and that he acted in good faith with respect to, that portion.

Section 1.6664-4(b)(1), Income Tax Regs., provides:

The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of * * * law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer. * * *

Respondent bears the burden of production with respect to the penalty. See sec. 7491(c). The burden imposed by section 7491(c) is "'only to come forward with evidence regarding the appropriateness of applying a particular addition to tax or penalty to the taxpayer.'" Cherry v. Commissioner, T.C. Memo. 2013-3, at *14 (quoting Good v. Commissioner, T.C. Memo. 2008-245). Once that burden is met, petitioners bear the burden of proving that they are entitled to relief under section 6664(c)(1). See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

Respondent determined that petitioners are liable for accuracy-related penalties on the basis of underpayments attributable to negligence or substantial understatements of income tax for 2008 and 2009. Respondent has met his burden

[*39] of production with respect to petitioners' negligence for both years. The record shows that petitioners failed to report a large portion of the gross receipts of Alan's Asphalt on Schedule C and failed to maintain records adequately to substantiate many of the business' claimed costs and expenses. Petitioners admit that their claimed labor costs were merely estimates. They have stipulated that they did not accurately report expenses for many claimed deductions on their 2008 and 2009 returns and have agreed that there is a deficiency in tax of $30,647 for 2009. Thus, petitioners are liable for the section 6662(a) penalty on the ground of negligence for both years unless they meet the section 6664(c) exception for reasonable cause and good faith.[9]

Petitioners argue that they acted with reasonable cause and in good faith because they relied on the advice of an accountant in preparing their tax return. Reliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith. See sec. 1.6664-4(b)(1), Income Tax Regs. Rather, reasonable cause may be found where the taxpayer selects a competent tax adviser, supplies the adviser with all relevant information, and, in a manner consistent with ordinary business care and prudence, relies on the

---

[9]Because petitioners' negligence is sufficient to sustain the penalty, the Court need not address the applicability of the penalty based upon the ground of substantial understatement of income tax.

**[\*40]** adviser's professional judgment as to the taxpayer's tax obligations. See

United States v. Boyle, 469 U.S. 241, 251 (1985); Neonatology Assocs., P.A. v.

Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). The

professional's advice must be based on all pertinent facts and circumstances; "if

the adviser is not versed in the nontax factors, mere reliance on the tax adviser

may not suffice." Todd v. Commissioner, T.C. Memo. 2011-123, 2011 WL

2183767, at \*9, aff'd, 486 Fed. Appx. 423 (5th Cir. 2012); see also Gould v.

Commissioner, 139 T.C. 418, 460 (2012), aff'd, 552 Fed. Appx. 250 (4th Cir.

2014).

Petitioners have not introduced any evidence regarding their accountant's

qualifications. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

Moreover, they have failed to demonstrate that they provided him with all relevant

information. Id. At trial Mr. Sawyer testified that the inaccurate figures reported

on the returns were derived from figures he himself added up and provided to

petitioners' return preparer and that he did not provide the return preparer with the

underlying invoices or receipts. Mr. Sawyer also admitted that the claimed labor

cost was merely an estimate. Petitioners have failed to show that they are entitled

to relief under section 6664(c)(1). The Court sustains respondent's imposition of

the section 6662(a) accuracy-related penalty for both years.

**[*41]** IV.     <u>Conclusion</u>

Petitioners are liable for the deficiency for tax year 2008 to the extent set forth herein.  Petitioners are liable for the section 6662(a) accuracy-related penalty for both years as applied to the redetermined deficiencies.  To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.